In re Gary LAZAR and Divine
Grace Lazar, Debtors.

In re CALIFORNIA TARGET
ENTERPRISES, INC. et
al., Debtors.

Bankruptcy No. LA 92–39039 SB.
No. LA 92–39042.

United States Bankruptcy Court,
C.D. California.

April 1, 1997.

David Gould, McDermott, Will & Emery, Los Angeles, CA, for Debtor.

David S. Chaney, Deputy Attorney General, Office of The Attorney General, Los Angeles, CA.

Gil Garcetti, District Attorney (L.A.), Alfred A. Coletta, Robert M. Brodney, Los Angeles, CA, for Gil Garcetti.

## AMENDED OPINION ON DISTRICT ATTORNEY'S APPLICATION FOR ADMINISTRATIVE EXPENSE PRIORITY

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

This application raises the issue of whether criminal fines and penalties imposed on both the corporate and the individual debtors in this case, for failure to conduct postpetition remediation of prepetition environmental contamination, are entitled to administrative expense priority.

The court holds that, where the fines and penalties arise solely from the postpetition failure to remediate prepetition contamination, the fines and penalties do not qualify for administrative expense priority in any respect. The fines and penalties fail each of the requirements for an administrative expense claim: they are not postpetition, they are not actual and necessary, and they do not benefit the estate.

Furthermore, Congress clearly decided which fines and penalties qualify as administrative expenses. Congress limited this category to fines arising from postpetition taxes. The environmental fines in this case do not qualify.

### II. FACTS

#### A. The Consolidated Cases

This case consists in nine substantively consolidated cases filed by corporations origi-

nally controlled by Divine Grace Lazar and Gary Lazar. The corporate cases are jointly administered with the personal joint case of the Lazars. The Lazars and their entities owned, operated or leased some 200 retail gasoline stations in Southern California.

California Target Supply, Inc. filed the first chapter 11 case in 1991. Approximately a year later, on July 27, 1992 the Lazars filed their joint personal chapter 11 case and eight additional corporate chapter 11 cases. George Schulman was appointed as chapter 11 trustee in September 1994 for all of the cases. A year later the cases were converted to cases under chapter 7, and Schulman was appointed as the chapter 7 trustee on December 28, 1994.

Leaking tanks at retail gasoline stations constitute one of the most widespread environmental problems in the United States.[1] Prior to the 1990's, gasoline stations installed single-hulled tanks, which tended to rust and develop leaks as they aged. More recently, double-hulled tanks, which are much less prone to leakage, have been required. The leaking of older gas tanks has rendered nearly every gas station in the United States an environmental disaster. The Lazars specialized in the ownership of economically marginal older stations, where the tanks were especially prone to leakage.

The Lazars were apparently some of the worst actors in the retail petroleum industry. They were the first ever to be prosecuted for the criminal violation of the California environmental laws. According to the Los Angeles County District Attorney ("DA"), the Lazars were at the head of the list for prosecution for environmental crimes because, of their falsification of gasoline tank test reports.

The environmental law enforcement authorities depend on gas station owners and operators to test their own tanks for leakage, and to report the test results to the state. Tanks are tested periodically by pumping a pressurized inert gas into the tanks, and waiting a period of time to see whether the pressure holds. If the pressure decreases beyond a certain level, the tanks are diagnosed as leaking tanks, and must be replaced (at the owner's expense). The honest reporting of the pressure tests is an essential factor in the regulation of environmental hazards at gasoline stations.

The Lazars pleaded nolo contendere in a state criminal prosecution involving the underpayment of state taxes and the contamination of the ground at six gas stations.[2] They are now each serving eight-year state sentences for environmental crimes and tax evasion in connection with the operation of the gasoline stations. In addition, they have each pleaded guilty to federal crimes, some of which relate to the same conduct.

The state court imposed fines on each of the Lazars in the amount of $29,805,000, plus an additional $50,668,500 in penalties,[3] for a total of $80,473,500 [collective referred to hereafter as "fines".] While the state court imposed the majority of these fines for prepetition conduct, the court imposed a total of $11,970,000 in fines against each of the Lazars for postpetition contamination ("the postpetition fines"). These fines were imposed solely on the grounds that the defendants failed to discharge their statutory duty to remediate the prepetition contamination. The postpetition fines covered the period of time from the filing of the bankruptcy cases

---

1. The rule of thumb for environmental specialists is that every gasoline station location is an environmental disaster, that needs extensive cleanup. Apparently those owned by the Lazars and their business entities are particularly disastrous.

2. Presumably the DA could have prosecuted the Lazars and various corporate debtors in this case for contamination of other gas station sites as well. However, because the environmental prosecution was limited to the six stations, these stations alone are involved in the DA's claim now before the court.

3. California statute requires the assessment of a 170% penalty in addition to every fine imposed. CAL.PENAL CODE § 1464(a) (West Supp.1997) (100% penalty); CAL.GOV.CODE § 76000(a) (West 1993) (additional 70% penalty). The penalties are imposed to fund specific (mostly law-related) state government programs. CAL GOV.CODE § 1464(f) (West Supp.1997); CAL.GOV.CODE §§ 76100–76106 (West 1993).

until near the date of Schulman's appointment as chapter 11 trustee.[4]

In addition to the Lazars as individuals, the state criminal court imposed fines and penalties in the same amount against each of four corporate debtors against whom criminal charges were brought, after they each pleaded nolo contendere.[5] The fines against the six defendants totaled $149,025,000, and the penalties totaled an additional $253,342,500, for a grand total of $402,367,500.

A portion of the fines was imposed for the postpetition failure to remediate the prepetition environmental contamination. The total fines assessed against the six debtors for this postpetition failure was $71,820,000, and the postpetition portion of the penalties was $122,094,000, for a total of $193,914,000. The DA moves for administrative expense priority for $48,478,500, which constitutes his 25% share of the postpetition fines. There were no fines or penalties imposed for any other postpetition conduct of the debtors.

Schulman has been busy collecting assets in this case by selling gas stations and tracing assets secreted by the Lazars (some of them in foreign countries). The trustee has sold two of the six stations involved in the criminal prosecution, and two more are in escrow. One was under lease to one of the debtors, and the trustee has rejected the lease and returned the property to the landlord. The trustee continues to operate one station, and continues to try to market it. The DA has not claimed that the contamination at any of these six properties poses an imminent danger to public health or safety.

It now appears that the bankruptcy estate in this case will have sufficient funds to pay all secured claims, and a large portion (if not all) of the administrative claims, unless the fines here at issue are awarded administrative claim priority. It is unknown whether general unsecured creditors will receive any distribution. The general unsecured creditors presumably include a large number of environmental claimants, whose claims could be huge.

It is certain that the Lazars will not receive any assets from the estate.[6] Their right to any distribution from these consolidated estates is subordinate to the fines, which exceed $400 million, even if the fines do not enjoy administrative expense priority. 11 U.S.C.A. § 726(a)(4)–(6) (West 1993).

## B. The Administrative Claim for Environmental Penalties

The DA that brought the state law criminal prosecutions now applies for administrative expense priority for the fines assessed against the Lazars and the corporate debtors. It appears that initially the DA sought administrative expense priority for 100% of the fines attributable to the postpetition failure to remediate.[7] However, when the court recently requested the DA to specify on whose behalf he was seeking these funds, he reduced his claim to 25% of the postpetition fines.[8]

California Health & Safety Code § 25192 provides for the distribution of fines collected under the Hazardous Waste Control Law. It provides that 50% of the civil and criminal penalties collected under the law are to be deposited in the Hazardous Substance Account in the General Fund of the State of California, and that 25% are to be paid to the Department of Toxic Substances Control and used to fund the activity of the local health officer to enforce the provisions of the law. The final 25% goes to the office of the prose-

---

4. The amount of time covered by the postpetition fines varied from 272 to 428 days. Schulman was appointed as chapter 11 trustee 518 days after the bankruptcy cases were filed.

5. The amounts of the fines (and penalties) assessed against the two Lazars and the four corporations were all exactly the same.

6. The Lazars presumably would have qualified to exempt certain property. However, Divine Grace Lazar made no claim for exemptions, and Gary Lazar's exemptions were all disallowed.

7. In subsequent oral argument the California Attorney General has conceded that the DA had the authority to make a claim for the 75% state portion of the fines, as well as the DA's share.

8. This reduction in the DA's claim may have been made in oral argument on this motion on October 24, 1996. While there is no reference to the 25% claim by the DA in that portion of the oral argument, the language could be so interpreted in light of the later reduction in the claim.

cutor who brought the criminal action, in this case the Los Angeles County District Attorney.

Thus 75% of the fines are payable to the California state government. The DA's newfound relinquishment of this 75% is apparently intended to bolster the State of California's contention that it has not waived its Eleventh Amendment immunity by filing claims and defending its secured creditor status in this case. *See Schulman v. California State Water Resources Control Board (In re Lazar)*, 200 B.R. 358 (Bankr.C.D.Cal. 1996).

## III. PRIORITY FOR FINES AND PENALTIES

 The priorities for the distribution of the unsecured assets of a chapter 7 bankruptcy estate are provided by Bankruptcy Code § 726(a), which establishes the following six categories:

(1) priority claims (in order of priority set forth in section 507);

(2) timely filed general unsecured claims (plus certain unsecured claims owing to creditors who failed to receive notice in time to file timely claims);

(3) late-filed claims;

(4) claims for fines, penalties, forfeitures and punitive (or multiple) damages, unless they are compensation for actual pecuniary loss;

(5) interest on claims;

(6) equity holders.[9]

11 U.S.C.A. § 726(a) (West 1993 & Supp. 1997). All claims of a given category must be paid before any claims in a lower category are entitled to any distribution. *Id., §* 726(b). If the funds available are insufficient to pay all claims in a given category, the claims in that category are paid pro rata. *Id.*

Section 507(a) subdivides the first category, for priority claims, into nine levels, four of which appear to be relevant in this case:

(a) administrative expenses, fees and charges (§ 507(a)(1));

(b) claims up to $4000 for wages, salaries or commissions (§ 507(a)(3));

(c) spousal and child support claims (§ 507(a)(7));

(d) most tax claims (§ 507(a)(8)).

11 U.S.C.A. § 507(a) (West 1993 & Supp. 1997). Like the categories set forth in section 726, all priority claims of a given level must be paid before any claims at a lower level are entitled to any distribution. *Id.* If the funds available are insufficient to pay all claims at a given level, the claims at that level are paid pro rata. 11 U.S.C.A. § 726(a) & (b) (West 1993 & Supp.1997).

 Where, as in this case, a case is converted to a chapter 7 liquidation from a case under another chapter (such as chapter 11), the chapter 7 priority expenses must be paid before the priority expenses incurred prior to the conversion. 11 U.S.C.A. § 726(b) (West Supp.1997).[10] Thus all priority expenses arising from these consolidated chapter 7 cases must be paid before the chapter 11 administrative expenses may be paid. The trustee estimates that funds are available in these cases to pay all chapter 7 priority claims, and at least some chapter 11 priority claims. The extent to which chapter 11 administrative expenses can be paid turns in part on the results of this application by the DA.

The DA is apparently claiming priority as a chapter 11 administrative expense, and not as a chapter 7 administrative expense. Thus, even if the claim is allowed in full, it will only be paid after the payment of all chapter 7 priority claims.

Unless the DA prevails on this motion, his claim fall in the fourth category for claims. The DA makes no contention that his claim is for compensation for actual pecuniary loss.

---

**9.** Where the debtor is an individual, this level is the debtor himself or herself.

**10.** This rule does not apply to the lowest category of priority claims, not relevant in this case, based

on commitments by a debtor to a federal depository institutions regulatory agency to maintain the capital of an insured depository institution. *Id.*

Given the uncertain and presumably large quantity of general unsecured debt, it appears unlikely that creditors below that level will receive any distribution in this case. For this reason, the DA would like to improve his position from category (4), where he may receive no distribution, to category (1)(a), where can be certain to receive at least some distribution in this case.

## IV. ADMINISTRATIVE EXPENSES

■ What qualifies as an administrative expense is defined generally in section 503(b), which provides in relevant part:

> [T]here shall be allowed administrative expenses ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

11 U.S.C.A. § 503(b)(1) (West 1993 & Supp. 1997).[11] The DA contends that he qualifies for administrative expense priority for a portion of his fines.

■ Under Ninth Circuit law, to qualify for the highest priority as an administrative expense under section 503(b)(1)(A), an unsecured claim must meet the following requirements: (1) be incurred postpetition, (2) be an actual and necessary expense, and (3) directly and substantially benefit the estate. *Gull Industries, Inc. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386, 388 (9th Cir. BAP 1994); *Burlington Northern Railroad Co. v. Dant & Russell (In re Dant & Russell)*, 853 F.2d 700, 706 (9th Cir.1988); *see generally* KATHRYN R. HEIDT, ENVIRONMENTAL OBLIGATIONS IN BANKRUPTCY ¶ 6.03[5] (1993) (summarizing case law). These requirements are strictly construed, to keep administrative expenses to a minimum, and to preserve estate assets for the benefit of unsecured creditors. *Dant & Russell*, 853 F.2d at 706; *Hanna*, 168 B.R. at 388.

■ Under Ninth Circuit law, bankruptcy courts have broad discretion in determining whether to award administrative expense priority. *Dant & Russell*, 853 F.2d at 707; *Hanna*, 168 B.R. at 388. This discretion is limited, however, by the clear language of section 503(b)(1)(A) that such expenses must be the actual and necessary costs of preserving the estate. *Dant & Russell*, 853 F.2d at 707.

### A. Postpetition Claim

■ The first requirement for an administrative claim is that it be incurred postpetition, which means after the date of the filing of the bankruptcy petition. Prepetition claims do not qualify as administrative expenses, because there was no bankruptcy estate to administer until the petition was filed.

### 1. Postpetition Conduct

■ In his written papers the DA claims that he has shown two kinds of wrongful postpetition conduct by the debtors, that entitle his claims to administrative expense priority. First, he contends that the prepetition contamination has "likely" grown worse postpetition, because the hydrocarbon plumes at the gas stations are migrating toward the groundwater at many of the sites, and threaten to contaminate groundwater that is used to supplement the drinking water supply.

Second, Dr. Steve A. Carr, a research chemist at the Los Angeles County Sanitation District, states that contamination found in the late 1980's has "likely" grown worse because petroleum continues to be lost through leaky underground tanks and deteriorated underground piping. However, the DA has made no effort to quantify the amount of such postpetition leakage, and there is no evidence that the state court gave any weight to any such leakage in assessing the fines against the debtors. Absent any better evidence of postpetition leakage, the court finds this evidence too speculative to

---

11. Section 503(b) also provides that several other kinds of expenses, not relevant to this motion, may qualify as administrative expenses. Furthermore, the list of kinds of expenses qualifying for administrative expense priority is not exhaus-

tive. *Alabama Surface Mining Commission v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1452 (11th Cir.1992). However, the DA does not contend that he qualifies for administrative priority apart from section 503(b)(1)(A).

provide a basis for an award of administrative expenses.

If the contamination presents an imminent and identifiable harm to the public health or safety, the debtor corporations could be compelled to conduct remediation at estate expense. *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 507 n. 9, 106 S.Ct. 755, 762 n. 9, 88 L.Ed.2d 859 (1986) (prohibiting bankruptcy trustee from abandoning property with containers of oil contaminated with toxic chemicals, where such abandonment violated state law); *Guterl Special Steel Corp. v. Economic Development Administration (In re Guterl Special Steel Corp.)*, 198 B.R. 128 (Bankr.W.D.Pa.1996) (denying motion for abandonment of former Manhattan Project property seriously contaminated with chemical and radioactive waste, and authorizing debtor or EPA to use funds subject to security interest to conduct remediation). However, it does not appear that the contamination at any of the locations in this case presents any such threat, and the DA has made no claim that it does. Furthermore, California has refused to allocate funds from its State Water Resources Control Board for such cleanup, and that decision is now in litigation before this court.

The DA thus has shown no active postpetition conduct by the debtors to justify an award of administrative expense priority to his fines. All of the acts by the debtors that caused these hydrocarbon plumes took place prepetition, insofar as the record shows. In fact, at oral argument the DA conceded that he has no proof of any active postpetition conduct by the debtors that caused environmental contamination.

**2. California Statute**

 The DA argues that he meets the requirement for administrative expense priority with respect to the prepetition contamination in consequence of California statute. The DA relies on California Health and Safety Code § 25189.5, the statute that provides for criminal sanctions for violation of certain California environmental laws. Subsection (b) of that statute provides for imprisonment for such violations:

> Any person who is convicted of knowingly disposing or causing disposal of any hazardous waste, or who reasonably should have known that he or she was disposing or causing the disposal of any hazardous waste, at a facility which does not have a permit ... shall, upon conviction, be punished by imprisonment ... for 16, 24, or 36 months.

CALIFORNIA HEALTH & SAFETY CODE § 25189.5 (West 1992). Subsection (e) provides for a fine for the violation of subsection (b):

> The court shall also impose upon a person convicted of violating subdivision (b) ... a fine of not less than five thousand dollars ($5,000) or more than one hundred thousand dollars ($100,000) for each day of violation....

*Id.*

While the criminal convictions of the six debtors were not based on unlawful disposal of hazardous waste after the filing of the bankruptcy cases, the DA contends that the "the day of violation" language in section 25189.5(b) extends the crime into the postpetition period. This language is defined in section 25189.5(f):

> For the purposes of this section ... "each day of violation" means each day on which a violation continues. In any case where a person has disposed or caused the disposal of any hazardous waste in violation of this section, each day that the waste remains disposed of in violation of this section and the person has knowledge thereof is a separate additional violation....

*Id.* Under this provision, a fine may be imposed for each day that illegal hazardous waste disposal has not been remediated. The state court imposed the criminal fines on this theory, and the fines covered more than a year after the bankruptcy cases were filed. The DA contends that these portions of the fines are postpetition administrative expenses.

The calculation of fines in environmental cases based on the duration of contamination is supported by important policy considerations. The California legislature has decided that environmental contamination should be cleaned up as soon as possible, and the

method of calculation of the section 25189.5(e) fine is designed to provide an incentive for such cleanup. Under the statute, the fines continue to increase so long as the contamination is unremediated. The propriety or enforceability of such a statutory scheme is not before the court. The only issue before the court is whether the determination of the amount of a fine in this manner under state law can turn a fine for prepetition conduct into an administrative claim under the Bankruptcy Code.

Under this theory, the corporate debtors could avoid the postpetition fines only by cleaning up the contamination while they were debtors in possession. Such remediation could only have been undertaken after authorization of this court, upon a showing that it was in the best interest of the creditors.[12] It is uncertain whether this test could have been met in this case.

Whether a claim qualifies for administrative expense treatment is decided under federal law, not California law. Congress alone determines the priority of distribution under bankruptcy law. *United States v. Noland,* —— U.S. ——, —————, 116 S.Ct. 1524, 1527–28, 134 L.Ed.2d 748 (1996); *Dant & Russell,* 853 F.2d at 709. California cannot adopt a statute that converts a prepetition bankruptcy claim into an administrative claim.[13] Thus the definition of "each day of violation" in the California statute does not determine whether a claim qualifies for administrative expense priority. To determine this issue, we must turn to federal bankruptcy law.

### 3. Bankruptcy Law

Most claims for administrative priority for environmental damage arise from postpetition costs of cleaning up the contamination. Such claims have a better case for administrative expense priority, because they are not subject to the statutory subordination of section 726(a)(4). Nonetheless, no case whose precedent is controlling on this court has given administrative expense priority to cleanup costs. Thus the DA faces an uphill struggle in his claim that his fines, which carry a statutory subordinate priority, can be elevated to administrative expense priority.

The DA's priority claim is so large in this case that, if it is allowed as an administrative expense, no non-priority creditors would receive any distribution, and the DA's claim would itself be far from satisfied. Furthermore, the claim would cause a large dilution in the recovery of the chapter 11 administrative creditors. So it was in the leading Ninth Circuit case, *Dant & Russell:* the effect of allowing Burlington Northern's claim as an administrative expense would have been effectively to wipe out the claims of all other creditors. *Id.* at 703. The court must therefore closely examine whether the expenses at issue in this case meet the requirements to qualify as administrative expenses.

#### a. Supreme Court Case Law

The leading United States Supreme Court case on whether prepetition debtor conduct can give rise to an administrative claim is *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In *Kovacs* the debtor had agreed to a prepetition injunction requiring him to clean up a highly polluted hazard-

**12.** In a case where the estate is solvent, or potentially so, the court would also have to take into account the interests of the shareholders. The estate presumptively belongs to the creditors pending such a determination. *Cf. Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351, 1360 (7th Cir.1990) (stating, in the context of an appeal of a chapter 11 confirmation, "Creditors effectively own bankrupt firms."). In this case, because of the criminal fines imposed by the state court, there is no chance that the owners of the corporations will receive any distribution.

**13.** California could adopt a statute that gives cleanup judgments the status of statutory liens or secured claims. *Ohio v. Kovacs,* 469 U.S. 274, 286, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985)

(concurring opinion of Justice O'Connor); *Dant & Russell,* 853 F.2d at 709. Presumably, California could adopt a statute giving the same status to fines imposed under section 25189.5(e). The classification of a debt as secured or unsecured depends on state law. *Kovacs,* 469 U.S. at 286, 105 S.Ct. at 711 (concurring opinion of Justice O'Connor). Such a lien would have to be respected in bankruptcy, and could give the state the priority of a lien creditor. To be effective, such a lien likely would have to prime the interests of secured creditors. California has not adopted any such statute, and any effort to do so presumably would be vigorously opposed by the secured credit community.

ous waste site.[14] After Kovacs had failed to perform the cleanup, the state obtained the appointment of a receiver, who took possession of the property and began the cleanup. While the cleanup was in progress, Kovacs filed his bankruptcy case. Ohio sought payment from Kovacs for the cleanup expense, on the grounds that the cleanup obligation was not a debt at all within the meaning of the Bankruptcy Code, and that it was thus not subject to the bankruptcy discharge. The United States Supreme Court found that the cleanup expense was a prepetition debt that was fully dischargeable.[15] *Id.* at 282–284, 105 S.Ct. at 709–711.

*Kovacs* is not helpful to the DA for three reasons. First, *Kovacs* the payment of actual damages to the state to compensate it for cleanup costs. In contrast, this case involves fines totally unrelated to any actual damages.

Second, the trustee has sold or is selling four of the six properties as to which fines were imposed, and has abandoned the lease to a fifth. To this extent, the trustee's obligation to clean up the properties has been satisfied. The Supreme Court stated in *Kovacs*:

> If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation Kovacs might have had to clean up the property would have been satisfied.

*Id.,* at 284 n. 12, 105 S.Ct. at 710 n. 12. Thus, for these five properties the trustee has in effect paid the costs of cleanup by receiving a reduced price for them. To any extent that the fines represent cleanup costs, the DA is attempting to charge the estate a second time for these expenses.

Third, in *Kovacs* the state did not try to collect the payment from the bankruptcy estate, even for the postpetition cleanup, presumably because the estate had insufficient

assets. In contrast, here the DA is making an administrative priority claim in the case.

### b. Ninth Circuit Case Law

Like *Kovacs,* the Ninth Circuit case law on whether a claim qualifies as a postpetition administrative expense also arises from actual cleanup expenses, which gave rise to actual, out of pocket losses to the claimants. Even this higher level of claim has not been granted administrative expense priority in the three reported circuit opinions.

The first and leading Ninth Circuit case is *Dant & Russell, supra,* which involved cleanup expenses incurred postpetition by the lessor of property contaminated by the debtor. In that case the debtor operated a wood treatment plant that had caused massive toxic waste contamination. The contaminants included dioxins, which are very potent carcinogens that had been linked to an increase in liver cancer in the neighborhood. While most of the plant was on debtor-owned land, the Ninth Circuit case involved the small portion of land leased from Burlington Northern Railroad Co. Oregon's Department of Environmental Quality brought to Burlington Northern's attention the massive toxic waste contamination and the debtor's postpetition failure to remediate it. Thereafter, Burlington Northern spent $250,000 to mitigate the most serious hazards on its portion of the site. It filed an administrative claim both for the costs already expended and for prospective cleanup costs.

The court denied Burlington Northern's application for administrative priority for either category of postpetition cleanup expenses, because the contamination was caused before the bankruptcy petition was filed. *Id.* at 708. The court found an implicit requirement that any administrative claim must have a distinct postpetition character, which was lacking in that case. *Id.* at 707.

The court in *Dant & Russell* also rejected a public policy argument that the cleanup expenses should be given administrative expense priority. The court held that Con-

---

**14.** The stipulation also included an injunction against any further pollution, and payment to the state of $75,000 to compensate the state for injury to wildlife.

**15.** The Court did not distinguish between the prepetition cleanup expenses and the postpetition expenses, presumably because the state did not argue that the postpetition expenses should receive separate treatment.

gress alone fixes the priorities under bankruptcy law, and courts are not free to formulate their own rules to raise or lower the priorities mandated by statute.[16] *Id.*

In *California Department of Health Services v. Jensen (In re Jensen)*, 995 F.2d 925 (9th Cir.1993), the Ninth Circuit decided whether cleanup expenses incurred directly by a state during a bankruptcy case were a dischargeable prepetition debt or a nondischargeable postpetition debt. The Jensens were the shareholders of Jensen Lumber Co., which filed a chapter 11 case (that was subsequently converted to chapter 7). At the time of filing, a cinder block tank on the corporation's property contained 5000 gallons of lumber fungicide with highly toxic chlorinated phenols. The California Water Board determined that any leakage could cause a major fish kill in the nearby river, and could possibly affect the health of downstream water users. The California Department of Health Services spent more than $900,000 to remove the fungicide, along with a high level of PCP contamination that it discovered in the soil.

Before the state undertook the cleanup of the site, the Jensens filed a no-asset chapter 7 case. After both the corporate and individual bankruptcy cases were completed and closed, the state asserted liability against the Jensens for their ten percent share of the costs of remediation.

The Ninth Circuit found that the state had sufficient knowledge of the potential liability of the Jensens for the environmental damage to create a contingent claim for cleanup costs in their individual bankruptcy case. *Id.* at 931. In consequence, the court found that the claim was a prepetition claim, and that it was discharged in their personal case. *Id.;* accord, *Lancaster v. Tennessee (In re Wall Tube & Metal Products)*, 831 F.2d 118 (6th Cir.1987).

The third Ninth Circuit case comes from the Bankruptcy Appellate Panel. *Gull Industries, Inc. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386 (9th Cir. BAP 1994),

like the case before this court, involved contaminated gas stations. The debtor and Gull Industries owned adjacent gas stations, both of which were contaminated with petroleum products. Hanna's petroleum leakage, however, was apparently more serious: it had reached the ground water, and it was flowing onto the Gull Industries property. In connection with a sale of its station, Gull Industries had hired an environmental cleanup specialist to clean up the site, at an eventual cost of $130,000. When Gull Industries demanded that Hanna put a stop to its flow of contamination, Hanna filed its bankruptcy petition. The trustee eventually emptied and removed the leaking underground storage tanks, but did not remove the underlying contaminated soil. Gull Industries applied for an administrative expense priority for its cleanup costs.

The court found that the petroleum leaks on Hanna's property had occurred prepetition, and that no new significant contamination was added to the property postpetition, even though contaminated subsurface water continued to migrate to the Gull Industries property after the bankruptcy filing. However, the bankruptcy court found that the postpetition migration of the contamination was "passive." In consequence, the Bankruptcy Appellate Panel found that the case was essentially equivalent to *Dant & Russell*, and upheld the bankruptcy court finding that the environmental damage only gave rise to a prepetition claim. *Id.* at 389. Thus, in the appellate court's view, there was no abuse of discretion in the bankruptcy court's determination that the cleanup costs qualified only as a general unsecured claim, and not as an administrative expense.

As in *Dant & Russell*, the appellate court in *Hanna* rejected the policy argument that the cleanup expenses should be given administrative expense priority as a matter of environmental protection policy. *Id.* at 390. Like the *Dant & Russell* opinion, the court held that Congress alone fixes priorities, and the courts are not free to alter them. *Id.*

---

**16.** The court noted (as Justice O'Connor had pointed out in her concurrence in *Kovacs* ) that a state that wants a higher priority for the enforcement of its environmental laws may give cleanup judgments the priority of statutory liens or secured claims. *Id.,* citing *Kovacs*, 469 U.S. at 286, 105 S.Ct. at 711. Oregon, however, had not enacted such legislation.

### c. Other Case Law

The DA contends that four cases arising in other circuits have found that penalties imposed postpetition for prepetition conduct qualify as administrative expenses under the Bankruptcy Code. The court finds none of these cases persuasive.

There is one reported judicial decision that *might* support the DA's position. In *Bill's Coal Co.*, 124 B.R. 827 (D.Kan.1991), the district court reversed the bankruptcy court's denial of administrative expense priority for $560,580 in civil penalties imposed for prepetition violations of surface mining laws and regulations. The debtor had ceased all mining operations on the date of filing its chapter 11 case. The fines resulted from postpetition enforcement actions filed before the conversion of the case to a case under chapter 7. As in this case, the fines were not compensation for environmental injuries or payment of remediation expenses: the funds collected were turned over to local school districts. *Id.* at 829.

The district court in *Bill's Coal* found that penalties assessed for prepetition misconduct or the continuing effects of prepetition misconduct do not qualify as administrative expenses. *Id.*, citing *Dant & Russell*. However, it held that penalties for postpetition misconduct or misconduct continuing into the postpetition period should be treated as administrative expenses. *Id.* at 829–30. The court found no persuasive reason to distinguish between compensatory and noncompensatory penalties in determining whether they qualified as administrative expenses. *Id.* at 830.

The district court reversed and remanded, because the stipulated facts did not clearly show which category applied to the misconduct. The court stated:

> That debtor ceased strip mining when it filed for bankruptcy does not force the conclusion that the violations were prepetition, since obligations to reclaim land or maintain certain land practices could continue regardless of whether debtor was actively strip mining.

*Id.* at 829. Notably, this is the only sentence that the court has found in all of the cases cited by the DA that arguably supports its claim for administrative expense priority for some of the fines in this case.

A second case on which the DA also relies is *Alabama Surface Mining Commission v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449 (11th Cir.1992). Like this case, *N.P. Mining* first had a chapter 11 phase with the debtor in possession, a second phase with a chapter 11 trustee, and a third phase of liquidation under chapter 7.

The court in *N.P. Mining* denied administrative expense priority for fines arising from the failure to effect postpetition remediation of prepetition contamination. The court stated:

> Section 503(b) begins with the *premise* that all the costs to be considered are postpetition and *some* of them will receive administrative-expense priority.

*Id.* at 1460 (emphasis in original). The court permitted administrative expense priority only for those fines arising from the postpetition operation of the mine by the debtor in possession and by the trustee. The court excluded from administrative expense priority any penalty assessed postpetition for the failure of the debtor or the trustee to abate a prepetition violation of the statute. *Id.* at 1459.

A third case on which the DA relies is *In re Double B Distributors, Inc.*, 176 B.R. 271 (Bankr.M.D.Fla.1994). In reliance on *N.P. Mining*, the court in *Double B* held that punitive fines attributable to environmental contamination that occurred prepetition and that continued unabated postpetition are not expenses ordinarily incident to operating the business postpetition, and do not qualify as administrative expenses. *Id.* at 274. In contrast, the court found that a $10,000 fine imposed for two postpetition leaks of untreated waste water and the postpetition failure of a piece of equipment constituted an administrative expense. Even though the trustee contended that he had acted reasonably, the court found this irrelevant to awarding this expense an administrative expense priority. *Id.* at 274–75.

The DA also relies on *In re Motel Investments, Inc.*, 172 B.R. 105 (Bankr.M.D.Fla.

1994), which involved penalties pursuant to a prepetition consent decree that required the debtor to bring a defectively constructed sea wall in a protected wetlands area into compliance with the permit for its construction. The court found that the penalties qualified as administrative expenses under *N.P. Mining*, because the state had brought an enforcement action prepetition and obtained a consent decree to remedy the violations. *Id.* at 108. The court also found that the debtor had continued in business postpetition, and that the violation continued postpetition. *Id.* at 107.

The court finds that none of these cases supports the DA's position in this case. Insofar as the fines assessed in this case were based on the postpetition conduct of the debtors, they are based on the postpetition failure to abate the prepetition contamination. Under *N.P. Mining* they do not qualify for administrative expense priority. Unlike *Motel Investments*, there was no prepetition consent decree in this case that governed the postpetition business conduct of the debtors or the trustee. Unlike *Double B*, the DA does not rely in this case on any postpetition leaks or equipment failure as grounds for the fines at issue.

The court also takes note of *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3d Cir.1985), where the debtor had operated a bearing manufacturing plant which generated hazardous industrial waste, and had a license from Southern Railway to dispose of sewage in a drainage ditch in Southern Railway's adjacent right-of-way. The court held that a South Carolina state administrative proceeding against Southern Railway to clean up the drainage ditch gave rise only to a general unsecured claim for indemnity against the debtor. *Id.* at 141 (citing *Kovacs*).

The DA argues that the debtors in this case continued to operate the business after the filing of the chapter 11 petitions, and that this supports his administrative expense claim. However, none of the fines arose from these operations. In consequence, even under *N.P. Mining* this argument provides no assistance to the DA.

### 4. The DA's Claim

 New, postpetition contamination must be shown, under the Ninth Circuit standards set forth in *Dant & Russell*, *Jensen* and *Hanna*, to support a claim for the costs of environmental remediation. The requirement that an administrative expense be postpetition cannot be met absent such new contamination. A continued postpetition deterioration or postpetition failure to remediate prior contamination does not satisfy this requirement.

The court concludes that the first requirement for administrative priority status, that the claim be incurred postpetition, has not been met in this case for the fines imposed in the criminal prosecution against the corporate debtors. Insofar as *Bill's Coal* may be construed to support the DA's position, the court holds that it is inconsistent with applicable Ninth Circuit authority.

### B. Actual and Necessary

The second requirement for an expense to qualify for administrative priority is found in the language of section 503(b)(1)(A), which mandates that the claim arise from the "actual, necessary costs and expenses of preserving the estate...." In determining whether expenses are actual and necessary, the court is guided by two leading cases, one from the United States Supreme Court, and one from the Ninth Circuit.

### 1. *Reading*

The leading case on the interpretation of the "actual and necessary" requirement is *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), which arose under the earlier Bankruptcy Act. While the chapter XI case was pending in *Reading*, a fire destroyed the debtor's eight-story industrial structure, along with a number of neighboring buildings. The neighbors contended that the fire resulted from the chapter XI receiver's negligence, and filed claims exceeding $3,500,000, substantially more than the estate's assets. The neighbors asserted that their claims were entitled to administrative expense priority. The Supreme Court agreed, and stated:

"[A]ctual and necessary costs" should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible. It has long been the rule of equity receiverships that torts of the receivership create claims against the receivership itself; in those cases the statutory limitation to "actual and necessary costs" is not involved, but the explicit recognition extended to tort claims in those cases weighs heavily in favor of considering them within the general category of costs and expenses [in bankruptcy cases].

In some cases arising under Chapter XI it has been recognized that "actual and necessary costs" are not limited to those claims which the business must be able to pay in full if it is to be able to deal at all. For example, state and federal taxes accruing during the receivership have been held to be actual and necessary costs of an arrangement. . . .

We hold that damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to "actual and necessary costs" of a Chapter XI arrangement.

*Id.* at 483–85, 88 S.Ct. at 1765–67 (footnotes omitted). In the Supreme Court's view, fairness required that the tort claims at issue enjoy administrative expense priority, because an insolvent business had been thrust upon the property owners by the operation of bankruptcy law. *Id.* at 477–78, 88 S.Ct. at 1762–63. Furthermore, the Court found that postpetition tort obligations of a bankruptcy estate should be imposed on the party who should bear the cost of purchasing insurance, and that the injured parties should enjoy the same priority as the expense for insurance premiums. *Id.* at 483, 88 S.Ct. at 1765.

■ From *Reading* arose the general rule that the postpetition tort liabilities of a business that continues to operate in bankruptcy qualify for administrative expense priority as actual and necessary expenses for the preservation of the estate. In this case, however, it is not tort liabilities for which the DA seeks administrative expense priority.[17] Thus he needs better authority than *Reading.*

## 2. *Dant & Russell*

■ The leading Ninth Circuit case on whether expenses qualify as actual and necessary for administrative expense priority is Dant & Russell, *supra.* According to the Ninth Circuit in *Dant & Russell,* two factors must be weighed in a chapter 11 case in determining whether expenses are actual and necessary: maintaining the estate in as healthy a form as possible for the benefit of the creditors, while allowing essential costs of administering the ongoing business venture to be paid up front in order to give the debtor its best shot at an effective reorganization.[18] *Id.* The court further stated that the terms "actual" and "necessary" must be construed narrowly to keep fees and administrative costs at a minimum: this limitation is necessary to protect the limited assets of the estate for the benefit of unsecured creditors. *Id.* However, when a claimant expends funds that preserve the estate, the claimant is entitled to administrative expense priority for its resulting claim. *Id.* at 709.

In this case the DA's claim fails the *Dant & Russell* test because the fines do not qualify as essential costs of administering the estate. The fines involved in this motion do not result from any operation of the business by the trustee, under chapter 11 or chapter 7, or even the operation of the business by the debtors in possession, except insofar as

---

**17.** In *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200 (1st Cir. 1985), the First Circuit extended the administrative expense qualification for postpetition tort claims to the postpetition portion of a compensatory civil fine for violating a prepetition preliminary injunction against committing a public nuisance by operating a laundry in violation of a zoning ordinance. The postpetition portion of the fine was determined by the amount of postpetition legal expenses incurred in prosecuting to settlement the injunction action.

**18.** Although this case is now in liquidation under chapter 7 of the Bankruptcy Code, the chapter 11 standard articulated in *Dant & Russell* applies to the evaluation of the DA's administrative priority claim, because the fines related to the time period when the case was pending under chapter 11.

there was no postpetition remediation of the prepetition contamination. The fines arise solely from the prepetition conduct by the debtors. If the debtors' business had been closed down on the date of filing the bankruptcy petitions, the fines would have been unaffected.

### c. 28 U.S.C.A. § 959(b)

■ The DA contends that the trustee has operated the gasoline station business of the debtors, within the meaning of 28 U.S.C.A. 959(b), and that this provides a basis for finding that the fines qualify for administrative expense treatment as actual and necessary expenses. This statute requires a trustee or debtor in possession to comply with applicable law in operating a business under the protection of the Bankruptcy Code. 28 U.S.C.A. § 959(b) (West 1993) states:

> [A] trustee ... appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

■ Under section 959(b) the trustee in this case is required to comply with applicable law in operating the estate's gas stations. This requirement has resulted in several hearings relating to the necessary permits for operating the gasoline stations. In appropriate circumstances, the trustee may be liable for fines or administrative penalties if he fails to comply with applicable law in the operation of the business. *See, e.g., Alabama Surface Mining Commission v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449 (11th Cir.1992).

However, section 959(b) provides little help for the DA, because it fails to specify the priority of a claim arising from the liability that it imposes. The Supreme Court noted in *Reading:*

> 28 U.S.C. § 959(b) ... establishes only the principle of liability under state tort and agency law, and does not decide from whom or with what priority tort claims may be collected.

*Id.*, 391 U.S. at 477 n. 7, 88 S.Ct. at 1762 n. 7. The allowability of the DA's claim is not in dispute in this case: the dispute only involves its priority. Section 959(b) provides the DA no assistance in promoting his claim to administrative expense priority.

The DA cites *N.P. Mining* in support of his section 959(b) argument. In finding that punitive civil penalties assessed for postpetition mining activities may qualify as administrative expenses, the court in that case examined two policies that it found underlying section 959(b).

The first policy, that a trustee must operate an estate in compliance with state law, supported its conclusion. The court stated:

> We find that a policy of ensuring compliance with state law is sufficient justification to place civil penalties assessed for postpetition mining operations in the category of ... cases in which costs ordinarily incident to operation of a business are accorded administrative-expense priority.

*Id.* at 1458 (internal quotes and citation omitted). Otherwise, the court stated, the bankruptcy estate would have an unfair advantage over its competitors by avoiding the costs of safety and environmental compliance. *Id.*

The court in *N.P. Mining* found that a second policy, a concern for compensating tort-like victims, did not apply to fines, because fines do not represent compensation for any injury. *Id.* at 1456. A policy of fairness to persons injured by the estate, which lies behind the tort liability priority as an administrative expense, does not apply to fines. *Id.* To the contrary, the court in *N.P. Mining* found that the policy of fairness is embodied in the statutory subordination of punitive penalties under bankruptcy law. *Id.*

The court in *N.P. Mining* limited the expenses qualifying for administrative expense priority to those claims arising from postpetition mining operations while the business was still operating. *Id.* at 1459. The court specifically excluded any penalty assessed postpetition for the failure of the debtor or the trustee to abate a prepetition violation.

*Id.* The court based this ruling on two grounds. First, the court found that a requirement that a debtor or trustee make such expenditures would frustrate the purpose of the bankruptcy statute, and deprive the estate of its "new day" beginning. *Id.* Second, the court found that, since the mining commission had not sought any prepetition abatement of the practices giving rise to the fines, the violations could not be sufficiently important to merit administrative expense priority. *Id.*

In this case, in contrast to *N.P. Mining,* the fines all arise from the debtors' prepetition operations. Thus *N.P. Mining* does not support a section 959(b) argument to promote the DA's claims in this case to administrative expense priority.

 Furthermore, the court finds unpersuasive an appeal to public policy, such as that relied on in *N.P. Mining.* The court does not have the power to alter the priorities established by Congress. If the DA is unhappy with his statutory priority, his remedy lies in Congress, not in this court.

### 4. *Midlantic*

A second United States Supreme Court case bears on the priority of environmental claims. In *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the Supreme Court prohibited the trustee from abandoning estate property without first using estate funds to take action to protect the public from 400,000 gallons of oil contaminated with PCB, a highly toxic carcinogen, that was stored on the property in deteriorating and leaking containers. The Supreme Court in *Midlantic* found that section 959(b) supported its determination that the trustee must act to protect the public health or safety. 474 U.S. at 505–07, 106 S.Ct. at 761–63; *accord, United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1010 (2d Cir.1991); *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.),* 831 F.2d 118, 123–24 (6th Cir.1987); *In re Environmental Waste Control, Inc.,* 125 B.R. 546 (N.D.Ind.1991) (requiring chapter 11 debtor to spend remaining estate assets on testing and cleanup of "spectacularly high concentrations" of pollutants that had contaminated the groundwater, even though the assets were cash collateral of a secured creditor). However, the Supreme Court in *Midlantic* was careful to limit its restrictions on the abandonment of estate property to require the trustee only to take action to protect the public health and safety from imminent and identifiable harm. *Id.,* 474 U.S. at 507 n. 9, 106 S.Ct. at 762 n. 9.

Unlike the *Midlantic* case, where potent carcinogens were leaking onto property open to the public, the DA in this case has made no contention that the contamination poses a threat of imminent and identifiable harm to the public health or safety. It is not at all clear that it would have been appropriate to expend estate assets (during any phase of these cases) to clean up the environmental contamination in this case. The *Midlantic* requirement that a trustee (or debtor in possession) effect such a cleanup provides no assistance to the DA in this case, because it involves conditions on a trustee's abandonment of property, and expenses that he must undertake before abandonment can be permitted. *Midlantic* did not involve fines or penalties, and it has no bearing on how (if at all) fines and penalties may qualify as actual or necessary for the preservation of the bankruptcy estate. Furthermore, the trustee has in fact disposed of all but one of the properties giving rise to the fines in this case to third parties, who have assumed the environmental liabilities.

The facts of this case do not warrant a broad expansion of the *Midlantic* language to find that fines levied for prepetition environmental violations qualify for administrative priority as actual and necessary expenses.

### 5. Fines and Penalties as Actual and Necessary Expenses

 The Ninth Circuit has construed narrowly the administrative expense priority under the *Reading* rule, and has limited it to "post-petition tort-like conduct." *Oregon v. Witcosky (In re Allen Care Centers, Inc.),* 96 F.3d 1328, 1331 (9th Cir.1996); *NLRB v. Walsh (In re Palau Corp.),* 18 F.3d 746, 751

(9th Cir.1994). Under Ninth Circuit law, where there is no active postpetition wrongdoing by the debtor or trustee, *Reading* does not apply. *Allen Care Centers*, 96 F.3d at 1331. In the Ninth Circuit, the *Reading* rule does not even extend to expenditures incurred to avoid potential tort liability. *Id.*

The DA has not expended any funds to clean up the sites involved in this case. In his moving papers the DA has admitted that he is not seeking to compel the trustee to undertake remedial cleanup action, nor does he propose to utilize the fines to remediate environmental damage. Furthermore, the DA has not claimed that he has made any actual expenditure of funds in any other respect to preserve the assets of these estates. Nonetheless, he claims that the fines and expenses qualify as administrative expenses. In support of this position the DA relies heavily on two reported cases [19] that have found fines to qualify as actual and necessary expenses in a bankruptcy case.

The DA relies most heavily on *N.P. Mining, supra.* The court in *N.P. Mining* [20] based its decision on 28 U.S.C.A. § 959(b). For the reasons stated *supra*, the court finds it unavailing to the DA.

Furthermore, the court in *N.P. Mining* specifically noted that it was taking a broader view of what expenses qualify for administrative expense priority than the Ninth Circuit in *Dant & Russell.* Id. at 1454–55. Insofar as *N.P. Mining* takes a different view from *Dant & Russell*, this court is bound by *Dant & Russell*, and is not at liberty to follow *N.P. Mining.*

The second reported opinion on which the DA relies most heavily is *In re Bill's Coal Co.*, 124 B.R. 827 (D.Kan.1991). In that case the district court reversed a bankruptcy court holding that some $560,000 in penalties

assessed postpetition did not qualify as administrative expenses, because the stipulated facts failed to distinguish clearly three categories of misconduct: prepetition misconduct, misconduct which started prepetition and continued postpetition, and misconduct that started postpetition. *Id.* at 829.

The court in *Bill's Coal* held that penalties assessed for prepetition misconduct, including the continuing postpetition effects of prepetition misconduct, do not qualify for administrative expense priority. *Id.* In contrast, penalties for misconduct beginning postpetition, or beginning prepetition but continuing postpetition, do so qualify. *Id.* at 830. The court found that the payment of such fines and civil penalties is a cost of doing business, that should be considered an administrative expense. *Id.*

*Bill's Coal* provides no assistance to the DA's effort to qualify his fines as administrative expenses. The misconduct in this case that gave rise to the fines clearly falls within the first category articulated in *Bill's Coal:* prepetition misconduct (including postpetition effects of prepetition misconduct). Under *Bill's Coal*, these claims do not qualify as administrative expenses.

Furthermore, the Ninth Circuit precedents, *Dant & Russell*, *Jensen* and *Hanna*, all involved actual expenses for cleanup costs that were actually undertaken, either by the state (*Jensen* ) or by a private party (*Dant & Russell* and *Hanna* ). These are the most important kinds of environmental claims. Cleaning up the dirt (or air, or water) is the most important goal to accomplish under the environmental remediation laws. Furthermore, in the Ninth Circuit cases these expenses were incurred and the cleanup was accomplished while the bankruptcy cases were pending.

---

**19.** A third case, *United States Department of Interior v. Elliott*, 761 F.2d 168 (4th Cir.1985), also found that civil environmental penalties assessed postpetition were administrative expenses. Unlike this case, the violations in *Elliott* arose after the bankruptcy petition was filed. *See* the district court opinion, *United States Department of Interior v. Elliott*, 40 B.R. 985, 987 (W.D.Va. 1984), *rev'd*, 761 F.2d 168 (4th Cir.1985). However, *Elliott* was based on a section of the former Bankruptcy Act that is different from the Bank-

ruptcy Code, and that case is no longer good law. *N.P. Mining*, 963 F.2d at 1452 n. 2.

**20.** Unlike many environmental cases, including the case before this court, *N.P. Mining* apparently did not involve contamination of property with toxic substances. Apparently the environmental harm in that case consisted principally in the failure to restore the property to a condition in which it would be usable for other purposes.

In contrast, there has been no cleanup of any environmental contamination (except in actions unrelated to the claim of the DA), either before or after the cases before this court were filed. Instead of costs of remediation, the DA's claim is solely for fines imposed on the bad actors, who are debtors in this case. The fines will not pay for any remediation. The DA has not shown that he has suffered any loss in consequence of the debtors' conduct. Furthermore, there very well may be other claimants in this case who have suffered losses and made claims resulting from the very conduct that led to the prosecution and the imposition of the fines.[21]

Criminal fines have a much less compelling case for administrative expense treatment than the actual costs of cleanup. Such fines cannot qualify for administrative expense priority, under Ninth Circuit standards, unless they are based on new postpetition contamination.

The court concludes that the DA has failed to satisfy the requirement that the fines be actual and necessary in order to qualify for administrative priority.

### C. Benefit to the Estate

The final prong of the administrative expense test requires that a qualifying expense provide an actual benefit to the estate. *Oregon v. Witcosky (In re Allen Care Centers Inc.)*, 96 F.3d 1328, 1330 (9th Cir.1996); *Dant & Russell*, 853 F.2d at 706. This limitation, like the "actual and necessary" requirement, is to protect the assets of the estate for the benefit of the unsecured creditors. *Dant & Russell*, 853 F.2d at 706. The Ninth Circuit found in *Dant & Russell* that section 503(b)(1)(A) specifically requires a showing of benefit to the estate. *Id.*

The cases on which the DA most relies, *Alabama Surface Mining Commission v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449 (11th Cir.1992), and *Bill's Coal Co.*, 124 B.R. 827 (D.Kan.1991), both hold that fines arising out of the ordinary operation of a business postpetition do not otherwise have to benefit the estate. Under those cases, the claimant does not have to show benefit to the estate for such fines to qualify for administrative expense priority. The law in the Ninth Circuit, as stated in *Dant & Russell* and *Allen Care Centers*, is to the contrary. Thus neither *N.P. Mining* nor *Bill's Coal* can support the DA's position on this element of an administrative expense claim.

The DA argues that the estate in this case benefits from the imposition of the fines because the punishment assures that these debtors will not cause the same violations again, and they deter others similarly situated in the business community. Neither of these factors creates a benefit to the estate. Benefit to the estate must be measurable in assets distributable to creditors, or the elimination of claims which would otherwise require creditors to share the assets with others. No such benefit arises from the prevention of further contamination by these debtors or the deterrence of others who are not before the court.

The DA also argues that the estate will have a competitive advantage over its competitors if the fines are not given administrative expense priority. However, the DA points to no competitive advantage that the debtors enjoy, and the court perceives none. The trustee is in the process of liquidating this estate, by selling the gas stations to third party purchasers, who must comply with the environmental laws. Furthermore, as noted *supra*, the fines result entirely from actions taken by the debtors prepetition. Neither the debtors (while in possession) nor the trustee has obtained a competitive advantage from the conduct giving rise'to the fines and penalties involved in this motion.

The court concludes that in this case the fines did not benefit the estate. Instead, if granted administrative expense priority, they would deplete the, estate and prevent any payment to creditors below the administrative expense level. Thus, the DA also fails to satisfy the final requirement for administrative expense priority.

---

**21.** The court does not know to what extent there are any such claimants, because the trustee has not yet filed claims objections nor proposed the payment of any claims (apart from administrative claims) in this case.

### D. Statutory Provision for Fines and Penalties

 There is yet another reason for denying the DA's motion. Statutory construction also requires that the fines and penalties not qualify as administrative expenses.

Section 503(b), providing for administrative expenses, is not silent on the issue of fines. There are three subsections in section 503(b)(1), the very section that provides that the actual, necessary expenses of preserving the estate qualify as administrative expenses. The third subsection explicitly provides administrative expense status for fines relating to postpetition taxes, whose administrative expense priority is provided in the second subsection. 11 U.S.C.A. § 503(b)(1)(B & C) (West 1993). *See In re Garfinckel's, Inc.,* 203 B.R. 814, 825 (Bankr.D.Conn.1996); *see also In re Potts & Co.,* 114 B.R. 92, 94 (Bankr.E.D.Pa.1990) (finding equitable grounds to subordinate under § 510(c)(1) penalties incident to a federal reclamation claim, which the parties stipulated to be an administrative claim). However, Congress declined to provide administrative expense status for any other fines or penalties.

This appears to be a case where it is appropriate to apply the rule, *inclusion unius est exclusio alterius:* "where law expressly describes [a] particular situation to which it shall apply, an irrefutable inference must be drawn that what is omitted or excluded was intended to be omitted or excluded." BLACK'S LAW DICTIONARY 763 (6th ed. 1990). For administrative expenses, Congress explicitly specified that fines relating to postpetition taxes qualified, and excluded all others. To the extent that *N.P. Mining* and *Bill's Coal* hold to the contrary, they are inconsistent with section 503(b)(1), and should not be followed.

### IV. CONCLUSION

The court concludes that the DA must fail in his attempt to bootstrap an administrative expense priority under Bankruptcy Code § 503(b)(1)(A) for his claim for a portion of the fines imposed in the related state criminal proceeding against the debtors in this case. The DA has failed to show that the fines satisfy any of the requirements of administrative expenses: they must be incurred postpetition, they must be actual and necessary, and they must benefit the estate.

Under authority outside the Ninth Circuit, fines may qualify for administrative expense priority, if they are based on postpetition action by the trustee or the debtor-in-possession. The fines in this case do not meet this requirement, as elaborated under case law. The debtors' failure to conduct postpetition remediation of prepetition environmental contamination does not qualify as postpetition conduct for this purpose.

Furthermore, the stricter Ninth Circuit law does not permit fines to qualify as administrative expenses at all, because they do not benefit the estate. The court also finds that the Bankruptcy Code itself requires this conclusion, because it grants administrative priority to fines solely where they relate to postpetition taxes.

Congress has spoken with a clear voice in determining the priority of a fine (not arising from postpetition taxes) in a chapter 7 case: section 726(a)(4) gives it the next lower priority after general unsecured creditors (including those who have filed untimely claims). The court concludes that it may not alter this Congressionally-mandated priority scheme.