## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 04-3621

IN RE:

  MARK A. SIDEBOTTOM,

*Debtor-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:03-cv-1639-LJM-WTL—**Larry J. McKinney**, *Chief Judge.*

ARGUED APRIL 13, 2005—DECIDED DECEMBER 9, 2005

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* This case involves a tangle of
bankruptcy issues under the Code as it existed prior to
the effective date of the Bankruptcy Abuse Prevention
and Consumer Protection Act of 2005 (BAPCP Act), Pub. L.
109-8, 119 Stat. 23 (2005). The debtor, Mark A. Sidebottom,
owned an eponymous construction company, Sidebottom
Builders, Inc. (SBI). David and Jamie Broyles are two of
Sidebottom's creditors, who had contracted with SBI to
build their dream home, but were left high and dry when
SBI ceased performance. Eventually, Sidebottom personally
and SBI as a company both filed for protection under
Chapter 7 of the Bankruptcy Code; a little while later,
before the Chapter 7 proceeding was fully resolved,
Sidebottom filed a petition for relief under Chapter 13. The
bankruptcy court and district court focused on the ques-
tion whether the Broyleses' claims for fraud and conversion

could be considered a liquidated, noncontingent debt for purposes of the Chapter 13 proceeding—if not, then the Chapter 13 proceeding was barred under 11 U.S.C. § 109(e), because the debt exceeded $290,525. The district court concluded the bar of § 109 indeed applied and that Sidebottom was thus not eligible for Chapter 13 relief. We agree that it was correct to dismiss Sidebottom's case, for the more fundamental reason that he was not entitled in these circumstances simultaneously to pursue Chapter 7 and Chapter 13 relief.

**I**

On April 6, 2000, David and Jamie Broyles hired SBI to construct a new residence on their property in Indianapolis, Indiana. The cost of the project was estimated at $968,862, which was to be paid in stages according to a schedule set out in the parties' written contract. In order to receive the scheduled payments, SBI had to submit to the Broyleses an application for payment certifying that the stipulated work had been completed. The contract permitted the Broyleses to withhold payment for a variety of reasons: defective work; the filing or threatened filing of a mechanic's lien; the failure of SBI to make payments properly to subcontractors or for labor, materials, or equipment; SBI's failure to follow the plans or requirements of the contract; or nonperformance of the work for that stage.

During the course of construction, the Broyleses made four payments to SBI totaling $678,205, or 70% of the full contract price. Their last payment was made on October 20, 2000. Shortly after that date, Sidebottom notified them that SBI could not perform the contract and that it planned to file for bankruptcy relief. Around December 29, 2000, the Broyleses began receiving notices from various subcontractors stating that the Broyleses were personally liable for payments that SBI owed to the subcontractors. The

Broyleses paid $21,285.62 to one subcontractor, Frank Proctor. On January 10, 2001, the Broyleses and SBI executed a "Contract Termination Agreement" in which SBI acknowledged its breach. The Broyleses then hired another construction company, Hamilton Homes, to complete the project at an additional cost of $700,919, well in excess of the remaining $290,658 due under the contract. On April 9, 2001, the Broyleses filed a complaint against SBI and Sidebottom in the Superior Court of Marion County, Indiana, seeking damages for breach of contract, fraud, conversion, and unjust enrichment.

On April 23, 2001, hard on the heels of the Broyleses' suit, SBI filed a voluntary petition for bankruptcy under Chapter 7 of the Code. About nine months later, on January 23, 2002, Sidebottom followed with a personal Chapter 7 filing, which is the case of immediate relevance to this appeal. Sidebottom's petition naturally triggered an automatic stay of the state court proceedings against him, see 11 U.S.C. § 362(a). The Broyleses filed an adversary complaint in the personal bankruptcy, claiming that their fraud and conversion claims against Sidebottom were nondischargeable under 11 U.S.C. § 523(a)(2)(A). The bankruptcy court scheduled an adversary proceeding on the matter for April 9, 2003, while it granted a general discharge to Sidebottom with respect to his other debts on May 31, 2002.

At this point, matters became more complicated. Less than two weeks before the adversary hearing, on March 24, 2003, Sidebottom filed an overlapping petition for relief under Chapter 13, which insofar as the Broyleses' claims were concerned covered exactly the same debts as the ongoing Chapter 7 proceeding. Along with his application, Sidebottom submitted a proposed plan and schedule of assets and liabilities. He listed the Broyleses' claim as a nonpriority, unsecured, disputed, unliquidated, and contingent claim of an "unknown" amount along with

$350.14 in unsecured priority claims and $8,658.33 in other unsecured nonpriority claims in the schedule. His proposed plan represented that he would make 36 monthly payments to his creditors in the amount of $100.00, totaling $3,600.

The bankruptcy court assumed that the new Chapter 13 filing required a stay of the scheduled adversary hearing in the Chapter 7 case. On July 13, 2003, it ordered the proceedings in the Chapter 7 nondischargeability action stayed "until completion by the Debtor of all payments required under a confirmed chapter 13 plan, or dismissal or conversion of the chapter 13 case." The Broyleses moved to dismiss Sidebottom's Chapter 13 petition on two grounds: first, that it was not filed in good faith, and second, that Sidebottom's debts exceeded the $290,525 limit imposed by 11 U.S.C. § 109(e). The Broyleses alleged that Sidebottom had filed the case for the sole purpose of avoiding the trial of the pending § 523(a)(2)(A) claim in the Chapter 7 proceeding. In addition, the Broyleses alleged that their fraud and conversion claims represented a noncontingent, liquidated, unsecured debt and thus were covered by the $290,525 cap in § 109(e). At the same time, the Broyleses filed an objection to the confirmation of the Chapter 13 plan, arguing that it was not filed in good faith and that it unfairly discriminated against them.

After an evidentiary hearing, the bankruptcy court dismissed Sidebottom's Chapter 13 petition on the ground that the Broyleses' claims constituted a liquidated, noncontingent debt greater than the statutory cap for eligibility under Chapter 13. The district court summarily affirmed the dismissal.

## II

Before this court, Sidebottom argues that the district and bankruptcy courts were mistaken to conclude that

the Broyleses' claim was liquidated. His argument is somewhat hard to follow, but essentially he appears to be asserting that the only party that owes money to the Broyleses is his company, SBI, and that there was no reason for holding him personally liable for SBI's debts. He goes on to assert that any contractual liability he himself may have had to the Broyleses was covered by the May 31, 2002, general discharge in the Chapter 7 proceeding. The fraud and conversion claims, which he seems to concede survived that discharge, are not readily ascertainable (indeed, he goes so far as to assert that the amount due under the contract with SBI was not readily determinable either). Last, he argues that the Broyleses' claims against him are contingent, again because they depend on piercing the corporate veil. The Broyleses, as one would expect, defend the bankruptcy court's ruling.

## A. *Simultaneous "Chapter 20" Filings*

Although the parties have focused on § 109(e), a more fundamental question is apparent on the face of these proceedings, namely, whether Sidebottom was entitled to maintain a Chapter 13 proceeding while a Chapter 7 proceeding involving the same debts was pending. A Chapter 13 case that *follows* a Chapter 7 case is a special form of serial or repetitive filing under the Bankruptcy Code; it has been nicknamed a "Chapter 20" filing. See Lex A. Coleman, *Individual Consumer "Chapter 20" Cases After* Johnson: *An Introduction to Nonbusiness Serial Filings under Chapter 7 and Chapter 13 of the Bankruptcy Code,* 9 BANKR. DEV. J. 357 (1992). In *Johnson v. Home State Bank*, 501 U.S. 78 (1991), the Supreme Court held that the Code did not expressly prohibit such filings where the Chapter 13 case was initiated after the Chapter 7 case had closed. Looking at other Code provisions governing serial filings, the Court wrote that "[t]he absence of a like

prohibition on serial filings of Chapter 7 and Chapter 13 petitions, combined with the evident care with which Congress fashioned these express prohibitions, convinces us that Congress did not intend categorically to foreclose the benefit of Chapter 13 reorganization to a debtor who previously has filed for Chapter 7 relief." *Id.* at 87.[1]

The facts in *Johnson* involved a Chapter 13 case that was begun after the conclusion of the Chapter 7 proceeding. Sidebottom's case, in contrast, involves a debtor's effort to institute a Chapter 13 proceeding during the pendency of the Chapter 7 proceeding—a move dubbed a "simultaneous Chapter 20" by the bankruptcy bar, to distinguish it from the *Johnson*-style "sequential Chapter 20." See *In re Hodurski*, 156 B.R. 353, 355 (Bankr. D. Mass. 1993) (finding no *per se* prohibition against simultaneous filings but dismissing on the basis of bad faith).

The courts are divided on the question whether a simultaneous "Chapter 20" filing is ever permissible. Unlike the bankruptcy court in *Hodurski*, the majority has endorsed a *per se* rule prohibiting a debtor from having more than one bankruptcy case open at any time. See, *e.g.*, *In re Turner*, 207 B.R. 373, 378 (2d Cir. B.A.P. 1997) (at the preliminary injunction stage, holding that a Chapter 13 case filed before the debtor receives his Chapter 7 discharge is a nullity); *In re Scruggs*, 320 B.R. 94 (Bankr. D. S.C. 2004) (citing cases); *In re Lord*, 295 B.R. 16 (Bankr. E.D. N.Y. 2003) (barring a debtor from filing a Chapter 13 proceeding before the

---

[1] Among the other important changes affected by the BAPCP Act is one in this area. The BAPCP Act amended the Code to bar a debtor from relief under Chapter 13 within four years of receiving a discharge under Chapters 7, 11, or 12, or within two years of receiving a discharge in a previous Chapter 13 proceeding. See BAPCP Act § 312, amending 11 U.S.C. § 1328. Because these changes apply only prospectively, however, see BAPCP Act § 1501, this statutory bar does not apply to Sidebottom's Chapter 13 case.

Chapter 7 case is closed even if the debtor has already received a discharge in the Chapter 7 case); *In re Jackson*, 108 B.R. 251, 252 (Bankr. E.D. Cal. 1989) ("[o]nce a bankruptcy case is filed, a second case which affects the same debt cannot be maintained"). The majority has relied on the Supreme Court's decision in *Freshman v. Atkins*, 269 U.S. 121 (1925), which involved a debtor who had been denied a discharge in one bankruptcy proceeding, and while that case was pending, had filed a second petition seeking to discharge both the debts listed in the first petition and some new debts. The Court allowed the petition only with respect to the new debts, writing that the "pendency of the first application precluded a consideration of the second in respect of the same debts." *Id.* at 122. It analogized this situation to the common law plea of "prior suit pending," which reflected "the general rule that the law will not tolerate two suits at the same time for the same cause." *Id.* at 123.

A minority of courts has refrained from adopting an absolute ban on simultaneous filings, but their rationale is not helpful to Sidebottom. They have noted that *Freshman* stands only for the limited proposition that a debtor may not maintain simultaneous applications relating to the same debts and thus is not wholly barred from maintaining two cases under different chapters of the Code in other situations. See, *e.g.*, *In re Kosenka*, 104 B.R. 40 (Bankr. N.D. Ind. 1989). Some courts have permitted a debtor to file a Chapter 13 petition to reorganize the debts that have survived the Chapter 7 discharge, provided that the debtor has already received the Chapter 7 discharge, even if the Chapter 7 case has not been closed. See, *e.g.*, *In re Young*, 237 F.3d 1168 (10th Cir. 2001); *In re Saylors*, 869 F.2d 1434 (11th Cir. 1989); *In re Ragsdale,* 315 B.R. 691 (Bankr. E.D. Mich. 2004); *In re Hodurksi*, 156 B.R. 353. These decisions focus on the lack of an express prohibition on this practice (in the pre-October 2005 Code, of course),

and on the rehabilitative purpose of Chapter 13. Rather than banning all Chapter 13 filings during the pendency of a Chapter 7 case, these courts assess the propriety of the Chapter 13 case in light of the good faith standard applicable to confirmations of Chapter 13 plans.

Although the courts have differed with respect to the permissibility of these "simultaneous Chapter 20" cases, there is general agreement that a debtor may not maintain two or more concurrent actions with respect to the same debts. Only the Tenth Circuit may have held otherwise, in *In re Young*, 237 F.3d 1168. The facts of *Young* are similar to those before us: the debtor received a general discharge in his Chapter 7 case, but one of his creditors had filed an adversary complaint alleging that the debt owed to it was nondischargeable. Before the bankruptcy court had a chance to resolve that dispute, the debtor "converted" his case to a Chapter 13 proceeding. Thus, as the Tenth Circuit saw it, nothing was left of the Chapter 7 proceeding. It described this course of events as a "Chapter 20" procedure and permitted the conversion. *Id.* at 1173. Any potential abuse on the debtor's part could be addressed, in the court's view, through the bankruptcy court's general power to ensure good faith in the creation and confirmation of the Chapter 13 plan.

The Second Circuit's Bankruptcy Appellate Panel, in contrast, apparently takes a stricter approach. In *Turner*, no general discharge had yet been granted at the time the Chapter 13 case involving the same debt was filed, but the BAP's language suggests to us that simultaneous proceedings over a debt that was excluded from the scope of a general discharge would be impermissible in its view. Quoting from *In re Kosenka*, 104 B.R. at 46, it observed that the Code is designed "to resolve a debtor's financial affairs by administration of a debtor's property as a single estate under a single chapter within the code." 207 B.R. at 378.

In our opinion, the Second Circuit's BAP and the majority of other courts have the better of this debate. It is possible, in fact, that the Tenth Circuit would not disagree about truly simultaneous proceedings, because it appears that the case before it was fully converted from a Chapter 7 proceeding to a Chapter 13 proceeding. Whether that is so or not, it seems to us that a debt like the Broyleses' claim against Sidebottom that is expressly excluded from a general discharge under Chapter 7 falls within the rule articulated by the *Turner* panel. As *Freshman* might have put it, the effort to litigate the same matter simultaneously in the Chapter 13 proceeding should have been rejected on the grounds of "same matter pending." This is not a case in which the Chapter 7 proceeding was finished except for some minor technicalities at the end, like the filing of a trustee's final report. Allowing Sidebottom to proceed with the Chapter 13 case significantly affects the Chapter 7 trustee's ability to administer the estate, because it will change how much each creditor gets paid if the Broyleses' claims are resolved through the Chapter 13 process.

### B. *Good Faith*

Although the bankruptcy and district courts relied on § 109(e) to support dismissal of Sidebottom's Chapter 13 case, the Broyleses also argued that it should be dismissed because it was filed in bad faith. Because it ruled on the other ground, the bankruptcy court did not make findings of fact on this point. In our view, however, it would be difficult to conclude otherwise on this record.

When determining whether a Chapter 13 petition was filed in good faith, courts take into account the following nonexhaustive list of factors: (a) the nondischargeability of the debt; (b) the time of the filing of the petition; (c) how the debt arose; (d) the debtor's motive for filing the petition; (e) how the debtor's actions affected creditors; (f)

the debtor's treatment of creditors both before and after the petition was filed; and (g) whether the debtor has been forthcoming with the bankruptcy court and the creditors. See *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir. 1992). Taken as a whole, they cast serious doubt on Sidebottom's petition.

Without an adjudication of nondischargeability under 11 U.S.C. § 523(a), it is impossible to say how the first factor cuts. It does appear, however, that the Broyleses had a nonfrivolous claim that they were prepared to pursue and that Sidebottom went to some lengths to avoid the moment of truth. Looking at factor two, we note that his Chapter 13 petition was filed a mere two weeks before the scheduled adversary hearing. According to the Broyleses, at least, the debt arose as a result of Sidebottom's fraudulent activities and the conversion of their money. If the bankruptcy court had rejected the Broyleses' position in the adversary proceeding, their debt would have been discharged along with all of Sidebottom's other debts, but if it had ruled in their favor, Sidebottom would have been faced with a substantial debt that was nondischargeable. This, we assume, underlies the Broyleses' belief that Sidebottom's primary motive in filing the Chapter 13 case was to avoid a negative result in the nondischargeablity action pending in the Chapter 7 proceeding. He also had a financial incentive to use Chapter 13, if one assumes a significant risk of losing in the Chapter 7 adversary proceeding: his proposed Chapter 13 plan would have forced the Broyleses to receive a *pro rata* portion of the proposed $3,600 he was offering to fund the Chapter 13 plan—a plan that is less than forthcoming about the nature of the Broyleses' claim. Before Sidebottom's eleventh-hour Chapter 13 petition, the Broyleses had spent considerable time and resources preparing for trial.

The record suggests that Sidebottom used the Chapter 13 filing simply to save the expense of defending the adversary action. Addressing the question of good faith before the

bankruptcy court, he reported that during the course of the Chapter 7 proceedings, there had been discussions between counsel with respect to his inability to fund the litigation and to pay the costs and fees necessary to complete it. There was also correspondence on January 15, 2003, which included an offer of settlement and indicated that Sidebottom was unable to participate in the adversary proceeding and would file a Chapter 13 petition in the event that it was necessary to do so prior to going to trial. None of this sounds like a proper use of the bankruptcy procedures to us, although in the absence of our conclusion above about the use of simultaneous "Chapter 20" filings we would probably remand this issue to the bankruptcy court for a finding of fact on good faith.

C.  *Eligibility under 11 U.S.C. § 109(e)*

Last, we address briefly the ground on which the bankruptcy and district courts relied in their judgments dismissing Sidebottom's Chapter 13 proceeding. As the bankruptcy judge pointed out, "[u]nlike other chapters of the Bankruptcy Code, debtors must meet specific debt requirements to be eligible for chapter 13 relief." The governing statute is § 109(e), which read as follows at the time Sidebottom filed:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $290,525 . . . may be a debtor under chapter 13 of this title.

(Under authority granted by 11 U.S.C. § 104, the Judicial Conference of the United States periodically revises the dollar amounts in various sections of the Bankruptcy Code, including § 109(e); the current amount applicable to § 109(e) is $307,675. This change does not affect our analysis of Sidebottom's case.)

The bankruptcy court began by noting that Sidebottom's Chapter 13 petition listed the Broyleses' claims as an unsecured nonpriority claim arising out of a lawsuit in an "unknown" amount. He checked the "contingent," "unliqui-dated," and "disputed" boxes on the form. Looking beyond Sidebottom's schedules to the complaint the Broyleses had filed in the state court, the court saw that the alleged fraud debt was $500,896.79, and the alleged converted funds were $254,156.91, representing payments made to SBI and Sidebottom that exceeded the value of the work performed. This was enough, in the bankruptcy court's view, to make the allegation that the amount was "un-known" misleading.

It went on to assess Sidebottom's eligibility under § 109(e) on the merits. The judge noted that the mere fact that a debt is disputed does not exempt it from being included in the § 109(e) calculation, citing *Matter of Knight*, 55 F.3d 231 (7th Cir. 1995), and *In re Nicholes*, 184 B.R. 82, 87 (9th Cir. B.A.P. 1995). Next, the judge decided that these debts were liquidated, because they could readily be computed by looking at the amount paid to SBI under the contract, the amount of the subcontractors' claims, the amount paid to Hamilton Homes to complete the project, and adjusting for the initial contract price. Even using conservative numbers, the court came up with a figure of $514,296.41, substan-tially in excess of the statutory ceiling. Importantly, Sidebottom did not contest these calculations: he argued instead that the debt could not readily be determined because his personal liability for SBI's debts was at issue. That point, however, does not address whether the debts are liquidated in amount; it focuses on who must pay them. Finally, the bankruptcy judge ruled that the debt was not contingent, as it did not depend on any future event.

Our only concern with this analysis relates to the ques-tion whether the debt was liquidated. The bankruptcy judge was certainly correct to include the disputed amounts in his

overall assessment of Sidebottom's schedule. There was nothing contingent about these debts, nor did anyone argue that they were secured. The judge was also entitled to look at the Broyleses' complaint, which was a matter of public record, to see what was at stake in the litigation. Like him, we find Sidebottom's indication that the amount of the debt was "unknown" to be disingenuous; he easily could have described the amount in controversy and said that it was disputed. The liquidation requirement, however, is more problematic. In a sense, the bankruptcy judge avoided it by noting (sensibly enough) that the disputed amounts took Sidebottom's case well over the § 109(e) ceiling. But that is not the same thing as saying that the amounts were readily determinable with any precision. Because there are alternate grounds on which the district court's judgment may be affirmed, we have no need here to decide exactly how precise these computations must be in order to satisfy the statute.

## III

We AFFIRM the judgment of the district court, which in turn affirmed the judgment of the bankruptcy court, dismissing Sidebottom's Chapter 13 petition.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*