In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3948

IN RE:

RESOURCE TECHNOLOGY CORPORATION,

*Debtor*.

APPEAL OF:

SAMUEL J. ROTI.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 3173—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 7, 2011—DECIDED OCTOBER 31, 2011

Before POSNER, FLAUM, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal presents a novel issue: the priority of a claim against the debtor's estate in a Chapter 7 bankruptcy for damages arising from a tort committed by the debtor during the interval between the appointment of the trustee in bankruptcy and the liquidation a few months later of the bankrupt's assets that had been the source of the tort.

The *dramatis personae* (besides the Chapter 7 trustee) are Roti, the claimant; Resource Technology Corporation, the

bankrupt (which the parties call "RTC"); and Congress Development Company ("CDC"), like Roti a creditor of the bankrupt estate.

Roti owned a Holiday Inn in a Chicago suburb. The hotel was adjacent to a landfill owned and operated by CDC. Back in 1996 CDC had hired RTC to build a system for preventing the methane, carbon dioxide, hydrogen sulfide, and other gases generated in the landfill from leaking; the system would also extract energy from the gas, which RTC would sell, paying CDC a royalty. So: a gas collection and control system.

In 1999 RTC was forced into bankruptcy under Chapter 11 (reorganization). Roti bought the Holiday Inn three years later, and in 2005 it followed RTC into Chapter 11, though for unrelated reasons. RTC's Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy (liquidation) in September 2005. A trustee was appointed on September 21 and six days later was authorized by the bankruptcy judge to operate the debtor's business for a period of just under three months, but the period could be extended and presumably would be until the liquidation was complete. RTC operated gas collection and control systems at other landfills, but the record is silent on how the liquidation of those assets proceeded.

Four days after the trustee was given operational control of RTC's business en route to liquidation, RTC's gas collection and control system at CDC's landfill failed; it had been malfunctioning for years and RTC had lacked the financial wherewithal to fix it. The system's failure

released foul odors that, traveling underground, wafted into the hotel through electrical outlets and floor cracks. The odors sickened guests and employees, resulting (according to Roti) in a disastrous fall off in the hotel's business.

Illinois's environmental protection agency issued notices of violation of the Illinois Environmental Protection Act and other environmental regulations to both RTC and CDC. RTC's trustee responded that the bankrupt estate had no money to repair the gas collection and control system. On January 13 CDC was permitted to, and did, terminate its contract with RTC, and by February 7 the trustee had abandoned all of RTC's assets at CDC's landfill.

RTC was required by state and federal law to comply with environmental regulations, and "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic National Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 507 (1986). There is no suggestion that the trustee abandoned RTC's assets at CDC's landfill either prematurely or belatedly.

In September 2006 Roti sold the Holiday Inn for $5 million. He claims that had it not been for the odors, he could have sold it for almost five times as much; his claim against RTC in the bankruptcy court is for the difference. (The reason it is his claim, rather than the claim of the LLC that owned the Holiday Inn, is that Roti,

the sole member of the LLC, caused the company's claim to be assigned to him.) Roti also sued CDC in an Illinois state court for having tortiously caused the damage to his business. That case has been settled.

The bankrupt estate has other creditors besides Roti. But he contends that his claim is an administrative claim that trumps the claims of the other creditors (with at least one exception, as we're about to note). Administrative expenses, which consist of the "actual, necessary costs and expenses of preserving the [bankrupt] estate," receive priority in the distribution of the estate's assets to creditors. 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2).

The bankruptcy judge, seconded by the district judge, rejected Roti's administrative claim, and Roti has appealed to us. CDC also filed an administrative claim against the bankrupt estate, seeking reimbursement of expenses that it had incurred to rebuild RTC's system before it terminated its contract with RTC. That claim was allowed, in the amount of $1.5 million—adding to Roti's indignation at the rejection of his administrative claim.

The emission of foul odors as the result of negligent maintenance of the gas collection and control system, which interfered with Roti's use and enjoyment of his property and caused economic loss and property damage, was a nuisance, *Woods v. Khan*, 420 N.E.2d 1028, 1030 (Ill. App. 1981); *Baldwin v. McClendon*, 288 So.2d 761, 763-66 (Ala. 1974); *Susquehanna Fertilizer Co. v. Malone*, 20 Atl. 900 (Md. 1890); *Restatement (Second) of Torts* § 822(b) (1979), and thus a tort. And a tort for

which RTC was responsible, though perhaps jointly with CDC, the owner of the landfill. Although RTC didn't own the landfill, its poor maintenance of its gas collection and control system was a cause and quite possibly the major cause of the leak of gas from the landfill into the Holiday Inn.

It is unusual for nuisance to be alleged against someone other than the owner or lessee of the property that emits the fumes or noise or dust or other harmful emanations that give rise to the nuisance claim. But the key to liability is not ownership; it's control. See *People v. Brockman*, 574 N.E.2d 626, 635 (Ill. 1991); *Laflin-Rand Powder Co. v. Tearney*, 23 N.E. 389, 390 (Ill. 1890); *Restatement (Second) of Torts* § 834 and comment c (1979). By virtue of its control of the gas collection and control system embedded in the landfill, RTC was the author of the nuisance, or at least a joint tortfeasor with CDC.

The trustee had been operating RTC's system for only four days before the failure occurred. The failure resulted from the many years of RTC's neglect, and there is no evidence that the trustee was aware of that neglect, did anything to exacerbate it, could have done anything to prevent the failure triggered by that neglect within the few days in which he was in nominal control of the system before it failed, or could have done anything to mitigate the damage afterward.

His predecessor, the trustee in RTC's Chapter 11 bankruptcy, had been appointed in August 2003 (until then— for remember that RTC had declared bankruptcy in 1999—RTC had operated without a trustee, as a debtor

in possession, as is common in Chapter 11 bankruptcies). That was two years before the Chapter 7 trustee was appointed; and maybe the Chapter 11 trustee bore responsibility for the neglect of the gas collection and control system. There no longer is a Chapter 11 estate from which Roti could seek relief, 11 U.S.C. § 348(e); Fed. R. Bankr. P. 1019(4); see *In re Sidebottom*, 430 F.3d 893, 897-99 (7th Cir. 2005); and "all claims actually filed by a creditor before conversion of the case are deemed filed in the chapter 7 case." Fed. R. Bankr. P. 1019(3). But Roti never filed a claim against the Chapter 11 estate, doubtless because the gas leak that hurt his hotel's business didn't occur until after the conversion.

Roti is right to note the oddity of a tort without a suable tortfeasor, but the fact that the Chapter 11 estate is not suable, nor the trustee in his personal capacity, still leaves the Chapter 7 estate as the suable party. A tort occurs not when the antecedent acts that precipitated it occurred but when there is an injury, *Jones v. Searle Laboratories*, 444 N.E.2d 157, 162 (Ill. 1982); *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 156 (7th Cir. 1996) (Illinois law), and so the nuisance in this case did occur on the Chapter 7 trustee's "watch," as the cliché has it. But he is no more personally responsible for it than the owner of an apartment house is responsible for the murder of one of his tenants by another tenant. The Chapter 7 estate is the suable tortfeasor, the trustee merely an innocent agent. And the Chapter 7 estate is RTC (more precisely, RTC's remaining assets), which caused the nuisance by neglecting to keep its gas collection and control system in good repair. The

neglect began years earlier but extended right up to the time the system failed, and it would be absurd to exonerate RTC because it changed from being a Chapter 11 bankrupt to a Chapter 7 one after most of the damage to the system by its neglect had been done. We add that if Roti's claim had been against the trustee as trustee, that is, in his official rather than personal capacity, it would have been treated as a claim not against him but against the debtor's estate, which is to say against RTC. *Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579, 584 (6th Cir. 1990); *In re marchFirst, Inc.*, 448 B.R. 499, 512 (Bankr. N.D. Ill. 2011). So we would end up in the same place.

Roti does have a claim against the bankrupt estate, and that makes him a creditor, yet he is not asking, as an alternative to the recognition of his claim, that he be dumped in with the general creditors; for him it is administrative claim or nothing, which is doubtless why the district court stopped with ruling that he has no administrative claim.

The reason administrative claims are given priority is that they are claims for reimbursement by the bankrupt estate of expenses incurred after the declaration of bankruptcy, in order to preserve and if possible enhance the value of the bankrupt estate for the benefit of its creditors. *J. Catton Farms, Inc. v. First National Bank of Chicago*, 779 F.2d 1242, 1249-50 (7th Cir. 1985). Such expenses are particularly important in a Chapter 11 case, in which the bankrupt business continues in operation with hopes (granted, they are usually dashed, as in the case of RTC) of survival as a going concern, albeit with

an altered capital structure, such as the substitution of the creditors for the pre-bankruptcy shareholders as owners of the business. Unless those who extended credit to a bankrupt business were given a priority claim, it would be very hard for such businesses to obtain credit, as they would be competing for a diminished pool of assets with the pre-petition creditors. *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986).

A tort victim (Roti) is a creditor, but not a creditor whose actions benefit his debtor, the tortfeasor. Yet in *Reading v. Brown*, 391 U.S. 471 (1968), the Supreme Court held that at least in a Chapter 11 bankruptcy, tort claims arising from the continued operation of the bankrupt business should be treated as administrative claims, like other post-petition expenses. See also *In re Chicago Pacific Corp.*, 773 F.2d 909, 913-14 (7th Cir. 1985); *In re Zilog, Inc.*, 450 F.3d 996, 999 n. 1 (9th Cir. 2006); *In re Boston Regional Medical Center, Inc.*, 291 F.3d 111, 124-25 (1st Cir. 2002). Tort liability is an expense of doing business, like labor or material costs, and should be treated the same way. Businesses operating in bankruptcy that were excused from tort liability would have an inefficient competitive advantage over their solvent competitors—and deficient incentives to use due care in the operation of the business. It could indeed be argued that in the interest of safety, insolvent firms, not being deterrable by threat of tort suits, should not be allowed to operate at all. *Reading* strikes a compromise between the safety interest and the interest in saving bankrupts from premature liquidation: the bankrupt

that continues to operate (normally under Chapter 11) must give its tort victims priority access to such assets as the bankrupt estate retains.

RTC was in Chapter 7 bankruptcy when the tort occurred; can the principle of *Reading* be extended to Chapter 7, given that the goal of such a bankruptcy is liquidation of the bankrupt's assets at the highest possible price rather than the continuation of the bankrupt's business? Sometimes yes; for the dichotomy between operation and liquidation is too stark. There is an interval between the appointment of the trustee and the liquidation of the bankrupt's assets under his supervision, and during that interval he may have operating responsibilities. The policy that supports the *Reading* doctrine—the policy against permitting bankrupt firms to externalize the costs of their torts—depends on whether the bankrupt firm is operating, not which part of the Bankruptcy Code (that is, whether Chapter 7 or Chapter 11) it is operating under. See *Pennsylvania Dep't of Environmental Resources v. Tri-State Clinical Laboratories, Inc.*, 178 F.3d 685, 689-93 and n. 7 (3d Cir. 1999); *Leavell v. Karnes*, 143 B.R. 212, 218-19 (S.D. Ill. 1990); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 123 (Bankr. D. Del. 2005).

But at least as far as the gas collection and control system in CDC's landfill was concerned, the bankrupt in this case was not operating in any meaningful sense during the brief period in which the trustee was in charge. It had some minute revenue from energy sales—less than 10 percent of its normal revenue from

such sales—but it is doubtful that this revenue covered its costs, or that the continued operation of the system in its diminished state can be attributed to anything other than the bankrupt's legal duty, noted in the Supreme Court's *Midlantic* decision, to minimize further contamination.

RTC had no money that the trustee could have spent on stemming the gas leak. Apart from the meager energy sales that we just mentioned, he did sell some gas engines for an amount not disclosed in the record (all we know is that it could not have exceeded $6 million). But the agreement of sale was made after CDC had terminated RTC's contract at the landfill, thus evicting RTC, so the trustee could not have used the proceeds of the engine sales to fix the leak. It's not as if he had embarked on a project to increase the value of RTC's assets and the workers on the project had committed a tort.

We thus are far from *Reading*, where the Chapter 11 receiver (equivalent to a trustee) was managing a building that was the debtor's principal asset, when the building burned down and in the process caused damage to adjacent buildings, triggering tort claims against the bankrupt estate. The receiver was either collecting rents or otherwise obtaining or attempting to obtain income for the estate from the building, and by doing so he was unavoidably running a risk of fire. In this case, in contrast, the trustee took over a bankrupt company at the point of collapse, and the collapse was unrelated to his control of the assets. He had neither the mandate nor the resources to do anything with them

except liquidate them as quickly as possible, which he proceeded to do. He could and did do nothing with the assets that might (with however low a probability) have enhanced their value for the creditors, in which event they would have had to take the bad with the good—the risk of tort liability along with the prospects for successful management of the assets. The trustee operated a losing venture under legal compulsion. There is no basis for applying the doctrine of *Reading* to such a case. See *In re Hemingway Transport, Inc.*, 954 F.2d 1, 5-6 and n. 5 (1st Cir. 1992).

AFFIRMED.