IN RE: Glenn Alan HAYNES and
Catherine Mary Haynes,
Debtors.

Case No. 15 B 39945

United States Bankruptcy Court,
N.D. Illinois, Eastern Division.

Signed 7/20/2017

Kevin Rouse, George Michael Vogl, Ledford Wu and Borges, LLC, Chicago, IL, for Debtors.

David Paul Holtkamp, City of Chicago, Department of Law, Chicago, IL, for City of Chicago.

Gerald Mylander, Lisle, IL, for Trustee, Glenn B. Stearns.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, United States Bankruptcy Judge

This matter comes before the court on the City of Chicago's Motion under § 503(a) for Allowance and Payment of Administrative Expense Claim. For the reasons stated below, the court denies the motion.

## BACKGROUND

Glenn and Catherine Haynes filed for relief under Chapter 13 of the Bankruptcy Code on November 23, 2015. Their plan was confirmed on March 18, 2016. The Order Confirming Plan provides that:

> All property of the estate, as specified by the [sic] 11 U.S.C. section 541 and 1306, will continue to be property of the estate following confirmation, unless (1) the plan provides for surrender of the property, or (2) the property is sold pursuant to the plan or court order.

Case No. 15 B 39945, EOD 36 (March 18, 2016).

The City of Chicago filed a proof of claim in the amount of $2,749.60 based on parking tickets that were issued between September 2010 and June 2014. This claim is scheduled to be paid pro rata with other general unsecured creditors.

While the Hayneses' Chapter 13 case was pending, the City issued two tickets for parking at an expired meter (the "Expired Meter Tickets") and one ticket for a red light violation (the "Red Light Ticket"). Glenn and Catherine do not dispute that these tickets were issued. The City did not submit copies of the tickets, and provided no information regarding who was operating the vehicle at the time each violation was committed.

According to the City's motion, the Expired Meter Tickets were issued pursuant to Municipal Code of Chicago ("MCC") Section 9–64–190(b) and the Red Light Ticket was issued pursuant to MCC Section 9–102–020.

By its motion, the City seeks administrative expense status for the claim based on the Expired Meter Tickets and the Red Light Ticket.

## LEGAL DISCUSSION

### The Standard for Determining Whether a Claim is an Administrative Expense.

11 U.S.C. § 503 provides the standard for determining whether a creditor's postpetition claim is classified as an administrative expense. For purposes of this opinion, the relevant portion of the statute is found at subsection (b)(1)(A):

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ... The City is asking the court to determine that the claim based on the Expired Meter Tickets and the Red Light Ticket is an "actual, necessary cost[ ] and expense[ ] of preserving the estate."

A successful reorganization (as opposed to liquidation) benefits prepetition creditors. In return for providing that benefit, and in light of the role they play in making a reorganization succeed, certain postpetition creditors are given priority over prepetition creditors, known as administrative expense priority. In fact, administrative expense claims are second in priority only to certain domestic support obligations and trustee expenses. 11 U.S.C. § 507(a)(1)(2).

In light of this superior position enjoyed by administrative expense claim-ants, the Seventh Circuit warns that when determining whether a claim warrants such treatment, courts must be mindful of the underlying purpose of the statute—rewarding those who facilitate a reorganization. Since the general rule in bankruptcy court is equality of distribution, "[a]ny preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress." Matter of Jartran, Inc., 732 F.2d 584, 586 (7th Cir. 1984) (citations omitted).

Therefore, the burden is on the party seeking an administrative expense to show, by a preponderance of the evidence, that its claim is entitled to that priority treatment. See In re DeMert & Dougherty, Inc., 227 B.R. 508, 512 (Bankr. N.D. Ill. 1998). "Administrative expense claims should be narrowly construed in order to keep administrative expenses at a minimum and thus preserve the estate for the benefit of all creditors" Id. at 513 (citations omitted).

To further the underlying statutory purpose of encouraging a successful reorganization while concurrently being mindful of the general rule of equality in distribution, the Jartran panel adopted a two part test for reviewing purported administrative expense claims: "Under these criteria a claim will be afforded priority under § 503 if the debt both (1) arises from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business." 732 F.2d at 587 (quotation omitted).

The City argues that because it is an involuntary creditor, a different test should be used to determine whether its claim is entitled to administrative expense priority. This different test was first discussed in Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968).

The question before the Supreme Court in Reading was whether to treat a tort claim arising during an arrangement (the precursor to Chapter 11) as an actual and necessary cost of the arrangement—thus giving it priority treatment—or as a general postpetition liability of the debtor.

The Reading Court held that "damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs' of a Chapter XI arrangement." Id. at 485, 88 S.Ct. 1759. The reasons such damages were awarded administrative expense priority were that the claim arose from a transaction with the debtor-in-possession and that payment of the claim before all other creditors would satisfy the notion of "fundamental fairness".

The Seventh Circuit explained the importance of Reading:

> Tort liability is an expense of doing business, like labor or material costs, and should be treated the same way. Businesses operating in bankruptcy that were excused from tort liability would have an inefficient competitive advantage over their solvent competitors—and deficient incentives to use due care in the operation of the business. It could indeed be argued that in the interest of safety, insolvent firms, not being deferrable by threat of tort suits, should not be allowed to operate at all. Reading strikes a compromise between the safety interest and the interest in saving bankrupts from premature liquidation: the bankrupt that continues to operate (normally under Chapter 11) must give its tort victims priority access to such assets as the bankrupt estate retains.

1. The City also briefly quotes J. Catton Farms, Inc. v. First Nat. Bank of Chicago, 779 F.2d 1242, 1249 (7th Cir. 1985): "[I]n Reading the Court had stressed the involuntary nature of the tort victim's relationship to the bankrupt."

In re Resource Technology Corp., 662 F.3d 472, 476–77 (7th Cir. 2011) (citations omitted).

The City argues that Reading's holding has been expanded beyond tort claims, and applies generally to all involuntary postpetition creditors of the estate. In support of its position, the City cites several Circuit-level cases. With one exception, all of these cases are from outside the Seventh Circuit and thus are not binding on this court.

The one Seventh Circuit case that the City puts forth to support this extension of Reading is Yorke v. N.L.R.B., 709 F.2d 1138 (7th Cir. 1983), cert. denied, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984).[1] In Yorke, the Circuit recognized that a Chapter 11 Trustee has a duty to bargain over the effects of a decision to terminate operations. The panel found that duty to be "critical to protect employees from the ravages of economic dislocation." Id. at 1143 (citations omitted).

> Since the obligation to bargain arises only with the Trustee's decision to terminate operations in the overall interests of the creditors, the costs concomitant with that decision properly can be attributed to the Trustee's efforts to "preserve the estate" on the creditors' behalf. As the bankruptcy court here determined, therefore, costs stemming from "effects" bargaining can be considered administrative expenses and thus fall within the ambit of the Trustee's authority. Cf. Reading Co. v. Brown, 391 U.S. 471, 482–84 [88 S.Ct. 1759, 20 L.Ed.2d 751] (1968) (those injured during administration of estate by Trustee

This was the City's only reference to Catton Farms, which makes sense as the creditor in that case was in a voluntary relationship with the debtor. The Catton Farms panel used that voluntary relationship to distinguish Reading.

entitled to priority claim as administrative expense)....

Id.

The Yorke panel focused on injury or loss as the crucial factor—the employees' back pay awards were an effect of the Trustee's efforts to preserve the estate, and thus were accorded administrative priority. The Circuit compared the employees' losses to the injuries suffered by the tort claimants in Reading, and found it appropriate to allow administrative expense priority to those losses even though no tort had been committed.

In this case, while the representative of the estate may have acted negligently or illegally (or neither, since we do not know who operated the vehicle when the tickets were incurred), the other half of the equation is missing. The City has suffered no discernable injury or loss that would compel expanding Reading to encompass this claim. This is not to give short shrift to the fact that someone violated the City's ordinances. It is instead an acknowledgement that no monetary loss was suffered.

Although other Circuits may have focused on the involuntary nature of the claim, this court is not bound by those decisions. By contrast, when it relied on Reading to allow an administrative expense priority, the Seventh Circuit was interested not just in the creditor's involuntary status, but also the nature of its claim. See Corporate Assets, Inc. v. Paloian, 368 F.3d 761, 773 (7th Cir. 2004) ("This court has recognized that fundamental fairness may, in appropriate circumstances, demand that a party **injured in some manner by the administration of the estate** be compensated pursuant to section 503.") (emphasis added) (citations omitted). In this case, there is no injury or loss, thus Reading's reasoning is inapplicable.

The City argued that Reading should apply anyway because, as discussed in two First Circuit opinions, debtors should not be allowed to "flout" the law.

So, too, is this case an even stronger one for priority than was Reading. The debtor in this case deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it. If fairness dictates that a tort claim based on negligence should be paid ahead of prereorganization claims, then, a fortiori, an intentional act which violates the law and damages others should be so treated.

In re Charlesbank Laundry, Inc., 755 F.2d 200, 203 (1st Cir. 1985) (citations omitted).

We think it would be fundamentally unfair to allow Cumberland Farms to flout Florida's environmental protection laws and escape paying a penalty for such behavior.

Cumberland Farms, Inc. v. Florida Dep't of Envtl. Prot., 116 F.3d 16, 21 (1st Cir. 1997).

The City's argument is not persuasive, because there is no evidence in this case that either Glenn or Catherine Haynes deliberately violated the City's parking, standing or compliance ordinances. We know only that tickets were issued to the registered owner(s) of a car that was property of the Hayneses' bankruptcy estate; we know nothing about the circumstances of the underlying violations. If the City wishes to come forward with evidence regarding the intent of the debtors at the time each of these violations occurred— including evidence that one or the other of the debtors were actually operating the vehicle at the time and so could form the requisite intent that was so important to the Charlesbank Laundry and Cumberland

Farms panels—the court may be willing to reconsider this point.

But even if the evidence showed that Glenn or Catherine deliberately flouted the law, and even if the court were inclined to extend Reading's reasoning to this particular claim despite the lack of monetary loss, there are other reasons not to do so. First, and most importantly, Reading was a Chapter 11 case. This is a Chapter 13 case. Although there is a great deal of overlap between these two chapters of the Bankruptcy Code. Chapter 13 is not a mini-Chapter 11.

As the Hayneses point out, the requirements and obligations imposed on them by the Bankruptcy Code are much less stringent than those imposed on Chapter 11 debtors-in-possession and trustees. The duties of these Chapter 11 participants are spelled out in great detail in 11 U.S.C. §§ 1106 and 1107. There is no parallel provision in Chapter 13 for debtors, only § 1303: "Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(1), of this title." The Chapter 13 debtor must also file a plan and make payments.

Courts in the Seventh Circuit have recognized various differences between the two chapters in numerous contexts, including:

● Plan confirmation

Confirmation of a Chapter 13 plan requires a substantially different inquiry than needed for a Chapter 11 plan. If a Chapter 13 plan meets the requirements contained in 11 U.S.C. § 1325 (which incorporates other bankruptcy provisions), then the bankruptcy court must confirm the plan. Creditors do not vote on a Chapter 13 plan. Cf. 11 U.S.C. § 1129(a)(10) (in Chapter 11 proceedings, at least one impaired class must

vote for the plan). Under Chapter 13, if a debtor proposes a plan which complies with 11 U.S.C. § 1325, a creditor has no grounds to object to the plan.

In re Fillion, 181 F.3d 859, 862 (7th Cir. 1999).

● Analysis of good faith

Granted, Chapter 13 is the individual's analogue to Chapter 11's business reorganization provisions. [In re ]Schaitz, 913 F.2d [452] at 453 [ (7th Cir. 1990) ]. Nevertheless, as this court noted in Schaitz, the good faith analyses differ under Chapter 11 and Chapter 13 because businesses and individuals are obviously different. Id. Indeed, as a consequence of this difference between individuals and businesses, objective futility seems meaningless in the Chapter 13 context. Objective futility in the Chapter 11 context focuses on whether a business is capable of surviving after reorganization. Carolin[ Corp. v. Miller], 886 F.2d [693] at 701 [ (4th Cir. 1990) ]. This is not an issue in an individual bankruptcy filed under Chapter 13 because, ordinarily, an individual's survival is not related to what happens in the Chapter 13 proceeding. Furthermore, even if objective futility could be defined in a meaningful manner in the Chapter 13 context, such an absolute requirement would negate the benefits of a case-by-case analysis under the totality of circumstances test.

Matter of Love, 957 F.2d 1350, 1356 (7th Cir. 1992).

● The effect of conversion

[A]s the trustee points out, there are numerous procedural and substantive differences between Chapter 11 and Chapter 13 proceedings. For instance, individuals may not file under Chapter 13 unless their debts are below a certain threshold, but there is no such threshold

for individuals who wish to file under Chapter 11. See 11 U.S.C. § 109(d)-(e). Debtors cannot be forced to file a Chapter 13 case, while creditors can force a debtor into a Chapter 11 bankruptcy. 11 U.S.C. § 303(a). The differences between Chapter 13 and Chapter 11 are replete with policy considerations, and Congress is better equipped at making these policy choices than the courts.

In re Meier, 550 B.R. 384, 390 (N.D. Ill. 2016).

The City does not cite one opinion that applies Reading v. Brown in a Chapter 13 case.[2]

The City's indifference to the gulf between the two chapters is illustrated by its argument that "once the chapter 13 case is filed, the trustee and general unsecured creditors are no longer on the sidelines of how a debtor manages her property." Motion at 10.

Certainly unsecured creditors in both chapters have more access to information about a debtor than they would outside of bankruptcy court. But in Chapter 11, the Code anticipates the appointment of a committee of unsecured creditors. Their powers and duties are described in 11 U.S.C. § 1103, and include the ability to "investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan" as well as "participate in the formulation of a plan." § 1103(c). This subsection concludes with a broad grant of power to "perform such other services as are in the interest of those represented." § 1103(c)(5).

There is no analogue to this section in Chapter 13. Creditors can use Fed. R. Bankr. P. 2004 to investigate the debtor, but there is nothing like the constant monitoring contemplated in Chapter 11. The City argues that "like the creditors in [U.S. Dep't of Interior v.] Elliott, [761 F.2d 168 (4th Cir. 1985)], if the creditors or the trustee find that the debtor is mismanaging the estate, they have recourse with the court." Motion at 11. This analogy is flawed. Elliott was a Chapter XI arrangement, the precursor to the current Chapter 11. The City skipped right over the reference in Elliott to the elected creditors' committee that is "empowered to, among other things, examine into the conduct of the debtor's affairs and to make recommendations to the supervising bankruptcy court concerning the debtor's operation of the business." 761 F.2d at 171 (footnote omitted). The idea in Elliott that "the creditors lose their innocence due to their ability to take action to prevent the debtor in possession from incurring post-petition penalties" is not a theory that fits Chapter 13 cases. Id. at 172.

In addition to the differences between Chapter 11 and Chapter 13, another compelling reason that Reading v. Brown should not be extended to this situation is that the City of Chicago has other remedies available to it. While the City cannot impound the Hayneses' car during the plan term without seeking court permission,

---

**2.** Dicta in one Seventh Circuit decision may, in the infrequent situation where a Chapter 13 debtor is engaged in business as contemplated by 11 U.S.C. § 1304, moot this particular argument. "The policy that supports the Reading doctrine—the policy against permitting bankrupt firms to externalize the costs of their torts—depends on whether the bankrupt firm is operating, not which part of the Bankruptcy Code (that is, whether Chapter 7 or Chapter 11) it is operating under." Resource Technology, 662 F.3d at 477. The Hayneses are not engaged in business, so this comment is inapplicable and does not affect the court's analysis.

there is nothing to prevent it from asking for relief from the automatic stay to do so.

Sometimes creditors even ask for conversion or dismissal of the bankruptcy case. The City could do the same. In fact, the City is in the best position of any party in interest to ask for conversion or dismissal if multiple postpetition parking, standing or compliance tickets are issued. After all, how would any other creditor know that tickets are accumulating?

The Hayneses also suggest that the City could file a motion to allow a postpetition claim under 11 U.S.C. § 1305(a)(2), insinuating that they would not oppose such a motion:

    (a)  A proof of claim may be filed by any entity that holds a claim against the debtor—

        (1)  for taxes that become payable to a governmental unit while the case is pending; or

    (2)  that is a consumer debt, that arises after the date of the order for relief under this chapter, and that is for property or services necessary for the debtor's performance under the plan.

The City disputes the availability of this remedy, under the theory that the tickets were not incurred by the Hayneses but by the estate. As discussed below at great length, the City's own ordinance imposes liability on the registered owner. Although we do not know who the registered owner is, we know it is not the bankruptcy estate, and so this theory does not hold water.

Instead, whether a motion to allow a postpetition claim would be granted depends on whether the court agrees that the Expired Meter Tickets and the Red Light Ticket constitute a consumer debt. "Consumer debt" is defined in the Code. It "means debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The claim must also be "for property or services necessary for the debtor's performance under the plan." If the City could satisfy both of those tests, a motion to allow its postpetition claim could be granted.

Finally, the City could simply wait for the bankruptcy case to conclude. This is not as draconian a remedy as it first appears, as only about one-third of all Chapter 13 cases are completed after the full three or five year term. 20,379 Chapter 13 cases were closed last year in the Northern District of Illinois. Of those cases, 13,766 were closed following dismissal and only 6,609 were closed following plan completion. See http://www.uscourts.gov/sites/default/files/data_tables/bapcpa_6_1231.2016.pdf (last retrieved July 14, 2017). The City might not have to wait too long to start collection procedures.

Even if the Hayneses successfully complete their plan, the City's postpetition debt for the Expired Meter and Red Light Tickets will not be discharged. And the City appears to have no problem waiting to collect on its tickets from the Hayneses. According to the proof of claim it filed for its prepetition debt, the City was owed $2,749.60 for tickets issued between September 2010 and June 2014. The Hayneses did not file for relief under the Bankruptcy Code until November 23, 2015, more than 17 months after the City's last unpaid ticket was issued.

For all of the reasons stated above—the Seventh Circuit's interpretation of Reading, the inapplicability of Reading to Chapter 13, and the City's alternative remedies—the court declines to apply the test set forth in Reading v. Brown to the City's request for administrative expense priority for its postpetition claim.

The City Failed to Prove by a Preponderance of the Evidence That its Claim Arises From a Transaction with the Estate.

■ Even if the court had determined that the Reading test applied here, the

first requirement of that test is that the debt must arise from a transaction with the debtor-in-possession. In this case, the City argues that because the Order Confirming Plan provided that the car remained property of the estate, it was the bankruptcy estate that owned the car. Thus, the estate would be liable for the violations that resulted in the Expired Meter and Red Light Tickets, and these transactions would have been with the estate.

The City argues that the car became property of the estate by operation of 11 U.S.C. § 541 upon the Hayneses' filing of their bankruptcy petition, and that the car remained property of the estate after confirmation due to the wording of the Order Confirming Plan. The City is correct on both counts. Confirmation usually vests property of the estate in the debtor, although the plan or the order confirming the plan may provide otherwise. 11 U.S.C. § 1327(b). The Hayneses' confirmation order, as do most confirmation orders in this district, provided otherwise:

> All property of the estate, as specified by the [sic] 11 U.S.C. section 541 and 1306, will continue to be property of the estate following confirmation, unless (1) the plan provides for surrender of the property, or (2) the property is sold pursuant to the plan or court order.

Order Confirming Plan.[3]

The City further asserts that no documents transferring title from the Hayneses

to the bankruptcy estate need to be executed in order for the car to be property of the estate. See Dardashti v. Golden, 2007 WL 7535054 (9th Cir. BAP Oct. 31, 2007). Again, the City is correct, if it were otherwise, an administrative nightmare would result every time a bankruptcy case was filed and the debtor's property became property of the estate. The commencement of a bankruptcy case constitutes an "order for relief" by the bankruptcy court. 11 U.S.C. § 301. "This is the legal event that causes the transfer to the bankruptcy estate of all legal and equitable interests of a debtor." In re Chesley, 550 B.R. 903, 910 (Bankr. M.D. Fla. 2016).

So the court agrees with the City that the car became property of the estate upon the filing of the bankruptcy case, that it remained property of the estate after confirmation by virtue of the Order Confirming Plan, and that no title transfer documents were required. Why then are the Expired Meter and Red Light Tickets not transactions with the estate?

These tickets were not transactions with the estate because the ordinance applicable to this situation—drafted by the City—states that someone other than the owner of the car is liable for the tickets.

The City cites MCC Section 9–100–030 for the proposition that "all parking, standing, and compliance violations, including automated red light and speed violations are incurred by and assessed against the owner of the vehicle." Motion at page 5.

---

**3.** The City devotes much of its reply brief to the origins of the form confirmation order used in this district, which is essentially identical to the order entered in this case. The brief also discusses the Seventh Circuit's approach to confirmation orders that keep property in the estate: "It would presumably be an abuse of discretion for the bankruptcy judge to confirm a plan that retained more of the property in the hands of the trustee than was reasonably necessary to fulfill the plan,

though we need not decide that in this case." Matter of Heath, 115 F.3d 521, 524 (7th Cir. 1997). The reply briefs analysis is interesting but not relevant. The City's ordinance places liability for parking, standing and compliance violations on the person in whose name the vehicle is registered. Therefore, because of the specific language chosen by the City, it is immaterial for purposes of deciding this motion that the car remained property of the estate after confirmation.

The City's summary of the Municipal Code of Chicago, however, is not as precise as the actual words of the ordinance. MCC Section 9–100–030 states:

9–100–030 Prima facie responsibility for violation and penalty—Parking, standing or compliance violation issuance and removal.

    (a)   Whenever any vehicle exhibits a parking, standing or compliance violation, **any person in whose name the vehicle is registered with the Secretary of State of Illinois** or such other state's registry of motor vehicles shall be prima facie responsible for the violation and subject to the penalty therefor.

http://library.amlegal.com/nxt/gateway.dll/ Illinois/chicago_il/municipalcodeofchicago? f=templates$fn=default.htm$3.0$vid= amlegal:chicago_il(last retrieved July 14, 2017) (emphasis added).

This language is repeated in the sections specifically applicable to the tickets at issue in this case:

Expired Meter Tickets

9–64–220 Parking violations—Enforcement—Prima facie responsibility designated.

    (a)   Whenever any vehicle is parked in violation of any provision of the traffic code prohibiting or restricting vehicular standing or parking, **the person in whose name the vehicle is registered with the Secretary of State of Illinois** shall be prima facie responsible for the violation and subject to the penalty therefor.

http://library.amlegal.com/nxt/gateway.dll/ Illinois/chicago_il/municipalcodeofchicago? f=templates$fn=default.htm$3.0$vid= amlegal:Chicago_il (last retrieved July 14, 2017) (emphasis added.)

Red Light Ticket

9–102–020 Automated traffic law enforcement system violation.

    **The registered owner of record of a vehicle is liable for a violation of this section and the fine** set forth in Section 9–100–020 when the vehicle is used in violation of Section 9–8–020(c) and a recorded image of the violation is recorded by an automated traffic law enforcement system.

http://library.amlegal.com/nxt/gateway.dll/ Illlinois/chicago_il/municipalcodeofchicago? f=templates$fn=default.htm$3.0$vid= amlegal:Chicago_il (last retrieved July 17, 2017) (emphasis added).

"Registered owner" is defined at MCC Section 9–4–010 as "the person in whose name the vehicle is registered with the Secretary of State of Illinois or such other state's registry of motor vehicles."

Therefore, all three subsections of the City's ordinances place prima facie responsibility for parking, standing and compliance violations on the same person—not simply the <u>owner</u> of the car, but the <u>person in whose name the car is registered</u>.

It is "the person in whose name the vehicle is registered with the Secretary of State of Illinois" or the "registered owner of record" (which, according to the MCC's definitions, means the same thing) who is <u>prima facie</u> liable for a parking, standing or compliance violation. The City could have written the ordinance to provide simply that the "owner" of the car is liable, but it chose instead to impose liability on "the person in whose name the vehicle is registered." Therefore, these tickets were not transactions with the estate. They were transactions with the person in whose name the ticketed car was registered.

Nevertheless, to support its contention that the estate is liable for these tickets,

the City cited In re Stokes, 2010 WL 3980232 (Bankr. E.D. Tenn. Oct. 8, 2010).

In Stokes, the City of Chattanooga, Tennessee sought an order directing the payment of certain real property taxes as administrative expenses of the Chapter 13 estate pursuant to 11 U.S.C. § 503(b)(1)(B)(i). The Chapter 13 Trustee argued that the claims were merely post-petition claims under 11 U.S.C. § 1305(a)(1).

The Stokes plan provided, as does the plan in this case, that property of the estate would not vest in the debtor until the plan was complete. Therefore, the real property owned by the Stokes debtor remained property of the estate.

The Tennessee bankruptcy court evaluated the property tax claim under a different subsection of § 503(b) than the one at issue in our case. The question in Stokes was not whether the claim was an "actual, necessary cost ... of preserving the estate," but instead whether the claim was a "tax incurred by the estate". Both questions, however, require a transaction with the estate rather than with the Chapter 13 debtor.

According to Tennessee law, "real property taxes become both a lien on the property and a personal debt of the property owner or property owners' as of January 1 of the tax year. T.C.A. §§ 67-5-2101." Stokes, 2010 WL 3980232 at *1. The court held, therefore, that "because the property belonged to the debtor's chapter 13 estate on January 1 ... the 2007, 2008, and 2009 taxes were 'incurred by the estate.' " Id. at *2.

In our case, however, the applicable City ordinance contains much more specific language than the Tennessee statute at issue in Stokes. In Tennessee, real property taxes become a personal debt of the property owner. In Chicago, whenever a vehicle incurs a parking, standing or compliance violation, it is the person in whose name the vehicle is registered with the Secretary of State of Illinois who is prima facie responsible for the liability. Since it interpreted a statute with different language than the one before this court, Stokes is not persuasive on the question of whether the Expired Meter and Red Light Tickets were incurred by the estate.

The Illinois Appellate Court has stated more than once that "one can own an automobile though the certificate of title is in the name of another." Pekin Insurance Co. v. U.S. Credit Funding, Ltd., 212 Ill. App.3rd 673, 677, 156 Ill.Dec. 789, 571 N.E.2d 769 (Ill. App. Ct.), appeal denied, 141 Ill.2nd 545, 162 Ill.Dec. 493, 580 N.E.2d 119 (1991) (quotation omitted). See State Farm Mutual Automobile Insurance Co. v. Lucas, 50 Ill.App.3rd 894, 898, 8 Ill.Dec. 867, 365 N.E.2d 1329 (Ill. App. Ct. 1977). These cases show by analogy that a bankruptcy estate can "own" a car while someone else is the "person in whose name the vehicle is registered with the Secretary of State." As a result, that person is prima facie liable for the ticket issued by the City of Chicago, and not the bankruptcy estate.

Therefore, while the bankruptcy estate takes the debtor's legal and equitable interests in the vehicle, and is the owner of the car, it is neither "the person in whose name the vehicle is registered" nor the "registered owner of record." The Expired Meter and Red Light Tickets were issued, pursuant to the City's ordinance, to the registered owner of the vehicle. Presumably that person was either Glenn or Catherine Haynes, or both. The court does not have this information, and in any event it is not necessary to know it to resolve this motion. The bankruptcy estate is not prima facie liable for the tickets, so these were not transactions with the estate. Therefore, the liability for the Expired

Meter and Red Light Tickets cannot be an administrative expense.

The City argues that the Hayneses received notice of these violations because "the debtor is in possession of the estate property, and is the correct party to sue and be sued on behalf of the estate." Reply at 3. This is a red herring. By virtue of the wording of the City's own ordinance, the Hayneses received notice because they are the registered owners of the vehicle and it is the registered owners who are prima facie liable for the tickets.

For all of the reasons stated above, the City failed to show by a preponderance of the evidence that its claim arises from a transaction with the estate.

### The City Failed to Prove by a Preponderance of the Evidence that its Debt Provided a Benefit to the Estate.

Since the City did not prove that its claim arises from a transaction with the estate, the court need not consider the second part of the Jartran test, which asks whether the transaction provided a benefit to the estate. In the interests of considering all possible arguments, however, the court will address this question.

### Expired Meter Tickets

Whether the Expired Meter Tickets provided a benefit to the estate is necessarily a fact-based question. The appropriate inquiry is whether the use of the particular parking spaces that resulted in the Expired Meter Tickets provided a benefit to the estate, such that the resulting debt should be treated as an administrative expense rather than as a general postpetition claim.

These two tickets are described as "Expired Meter in Central Business District." The court takes judicial notice of the map of the boundaries of Chicago's Central Business District, found on the City's website:

https://www.cityofchicago.org/city/en/depts/doit/dataset/boundaries__centralbusiness district.html(last retrieved July 17, 2017). This area is bounded by Halsted Street on the west, Lake Michigan on the east. Division Street on the north and Roosevelt Street on the south.

According to Schedule 1, Mr. Haynes works at 900 North Michigan Avenue in Chicago. This location is within the Central Business District boundaries. Mrs. Haynes works for Sam's Club. It is unclear where exactly she is employed, since the address she provided for her employer is in Bentonville, Arkansas.

It is possible that the Expired Meter Tickets were incurred by Mr. or Mrs. Haynes white one or both of them were at their place of employment. It is also possible that they were received when the Hayneses drove to the Central Business District to go shopping or attend some sort of entertainment, especially because both Expired Meter Tickets were issued on a Saturday. The first scenario would support the position that the Expired Meter Tickets provided a benefit to the estate; the second would not.

Administrative expenses are narrowly construed, however, and the City has the burden of proving a benefit to the estate by a preponderance of the evidence. Therefore, this uncertainty cuts against the City. Even if the court found that the Expired Meter Tickets were transactions with the estate, the facts before the court do not show by a preponderance of the evidence that they provided a benefit to the estate.

### Red Light Ticket

Did the Red Light Ticket provide a benefit to the estate? To answer this question, the court refers back to the earlier discussion of the priority assigned to claims that result from a debtor's deliberate violation

of the law. See Cumberland Farms, 116 F.3d 16; Charlesbank Laundry, 755 F.2d 200.

In this instance, the relevant law is MCC 9–8–020:

> (c) *Steady Red Indication.*
>
> (1) Except as provided in subsection (c)(3), vehicular traffic facing a steady circular red signal alone shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or if none, then before entering the intersection and shall remain standing until an indication to proceed is shown.

http://library.amlegal.com/nxt/gateway.dll/ Illinois/chicago_il/municipalcodeofchicago? f=templates$fn-default.htm$3.0$vid= amlegal:Chicago_il (last retrieved July 17, 2017)

If Glenn or Catherine Haynes, as the representative of the bankruptcy estate, intentionally chose to violate this section, a ticket would be issued pursuant to MCC Section 9–102–020:

> (a) The registered owner of record of a vehicle is liable for a violation of this section and the fine set forth in Section 9–100–020 when the vehicle is used in violation of Section 9–8–020(c) and a recorded image of the violation is recorded by an automated traffic law enforcement system.

http://library.amlegal.com/nxt/gateway.dll/ Illinois/chicago_il/municipalcode ofchicago?f=templates$fn-default. htm$3.0$vid=amlegal:Chicago_il (last retrieved July 17, 2017).

As discussed above, some courts allowed an administrative expense priority where debtors deliberately chose to "flout" the law, "presumably because it was more lucrative for the business to operate outside the . . . ordinance than within it." Charlesbank Laundry, 755 F.2d at 203.

The Charlesbank Laundry case determined that fairness demanded that claims resulting from these intentionally illegal acts be paid ahead of prepetition claims— and thus applied the reasoning of Reading v. Brown. If the Jartran test is applicable, the question would be whether the representative of the estate determined that an intentional violation of the law provided a benefit to the estate.

Under either theory, however, a crucial element is missing. There is no evidence that either Glenn or Catherine Haynes deliberately violated the City's ordinance. We know only that the Red Light Ticket was issued to the registered owner of the car. We know nothing about the circumstances of the underlying violation. Was the Red Light Ticket incurred because the representative of the estate intentionally violated the City's ordinance? Were Glenn or Catherine Haynes even operating the car at the time the Red Light Ticket was issued?

As stated above with respect to the Expired Meter Tickets, administrative expenses are narrowly construed. The City has the burden of proving by a preponderance of the evidence that its claim is entitled to administrative expense priority. Therefore, this uncertainty about the circumstances under which the Red Light Ticket was issued cuts against the City. Even if the court found that the Red Light Ticket was a transaction with the estate, the facts before the court do not show by a preponderance of the evidence either that it provided a benefit to the estate or that fundamental fairness requires giving it administrative expense priority.

## 28 U.S.C. § 959(b) Does Not Create a Category of Administrative Expenses

Finally, the City argues that 28 U.S.C. § 959(b), which requires trustees and debtors in possession to operate the

property in their possession in compliance with state law, is a basis for awarding administrative expense priority to those post-petition creditors who are harmed when an estate representative violates the law. See In re N.P. Mining Co., Inc., 963 F.2d 1449, 1458 (11th Cir. 1992) ("it makes sense that when a trustee or debtor in possession operates a bankruptcy estate, compliance with state law should be considered an administrative expense").

28 U.S.C. § 959(b) provides:

Except as provided in section 1166 of title 11 [which applies only in railroad reorganizations], a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

There are two problems with the City's argument. First, the case cited on this point by the City created only a very narrow category of new administrative expenses:

Chris–Marine points out that in N.P. Mining, the Eleventh Circuit recognized that it was creating a "new category of post-petition costs entitled to first priority" when it allowed purely punitive civil penalties assessed *post-petition* for *post-petition violations* of state mining regulations to be considered administrative expenses. As Chris–Marine effectively asserts, this was because strip mining is "heavily regulated" under state law, and as such there is a strong interest in insuring compliance with state law. As such, fines incurred by the trustee post-petition could be considered "costs ordi-

narily incident to the operation" of the strip mining business.... Therefore. Chris–Marine correctly points out that the so-called "new category" of expenses to be considered administrative in nature as set forth in N.P. Mining was actually a very narrow new category. In re Chris–Marine, U.S.A., Inc., 321 B.R. 63, 66 (M.D. Fla. 2004) (citations omitted).

More importantly, and putting aside the question of whether a statute that applies to trustees and debtors in possession also applies to Chapter 13 debtors, section 959(b) does not require or even imply that administrative expense status is required for debts incurred when a statute is violated. Certainly the City may have a claim for the penalty incurred by the violation of its ordinance, but the priority of such a claim is determined by other sections of the Code. See In re Lazar, 207 B.R. 668, 682 (Bankr. C.D. Cal. 1997) ("section 959(b) provides little help for the DA, because it fails to specify the priority of a claim arising from the liability that it imposes"). Whether a claim is entitled to administrative expense priority is due not to its genesis in a violation of state law, but because it represents an actual and necessary cost of preserving the estate.

In this case, the City did not show by a preponderance of the evidence that its claim represents such a cost. Therefore, it is not entitled to administrative expense priority.

## CONCLUSION

For all of the reasons stated above, the City's claim is not entitled to priority as an administrative expense. The motion is denied.